CHARLES F. REUTER *vs.* ARTHUR H. BALLARD.

Suffolk.    February 11, 1929. — June 5, 1929.

Present: RUGG, C.J., PIERCE, WAIT, SANDERSON, & FIELD, JJ.

*Contract,* Of employment, What constitutes, Implied, Validity. *Practice, Civil,* Exceptions.

At the trial of an action of contract, there was evidence that the defendant in March requested the plaintiff to secure in the outskirts of the city of New York land for oil tanks and to secure a permit for the storage of the oil from the city authorities, and promised the plaintiff that, in return therefor, he would form a corporation to sell the oil, would give the plaintiff one fourth of its capital stock and that the plaintiff should be employed at a salary of $15,000 per year for five years; that in May the defendant stated that the plaintiff should be manager of the new corporation and that he should be paid a salary of $15,000 for one year only, such arrangement to commence forthwith; that the plaintiff assented thereto; that the plaintiff secured an option upon a parcel of land and a storage permit in June; that the corporation then was organized; and that the defendant a few weeks later discharged the plaintiff and abandoned the storage project. A third count of the declaration was upon an account annexed. All counts were alleged to be for the same cause of action. The trial judge denied a motion by the defendant that a verdict be ordered in his favor on the third count. The jury returned a verdict for the plaintiff on that count in the sum of about $8,300. *Held,* that

(1) The defendant's motion properly was denied; a verdict for the plaintiff was warranted on the third count if the jury found, as they were justified in finding, that the defendant made the agreement with the plaintiff for compensating him, that the plaintiff performed his part of the agreement, but that the defendant did not agree to pay him $15,000 a year or any definite sum;

(2) A contention by the defendant, that he could not be held liable individually because he was known by the plaintiff to be acting for the corporation to be formed, was without merit.

There was further evidence at the trial above described that it was understood that the plaintiff was to do his best to get the storage permit: that he was to "do everything that was humanly possible to get it"; that the defendant said to the plaintiff that his future was assured if he could get the permit; that the plaintiff in his efforts to secure it had numerous conferences with various city officials concerned; and that, while the matter of the granting of the permit was pending, the plaintiff wrote a letter to the defendant stating that matters were progressing well, that some of the officials were showing a willingness " 'to play the game' with us, and knowing 'their game', as I do, it does not behoove us . . . to trying 'crowding' too hard." Illegality of the agreement between the plaintiff and the defendant was not alleged in the defendant's answer nor raised at the trial. *Held*, that

(1) The question of illegality was open to the defendant in this court upon his exception to the denial of his motion that a verdict be ordered in his favor;

(2) There was nothing in the evidence to show that the parties by their agreement contemplated that the plaintiff should, or that, in procuring the storage permit, he in fact did, resort to the use of corrupt action or exert improper influence upon the city officials which might impair their honest judgment in the matter of the granting of the permit.

CONTRACT. Writ dated January 25, 1926.

The action was tried in the Superior Court before *McLaughlin*, J. The pleadings and material evidence are described in the opinion. At the close of the evidence the judge denied motions by the defendant that a verdict be ordered in his favor on each count of the declaration. There was a verdict for the plaintiff under the third count in the sum of $8,307.50. The defendant alleged exceptions.

*J. W. Worthen & E. B. Cook*, (*H. C. Splane* with them,) for the defendant.

*A. J. Berkwitz*, for the plaintiff.

PIERCE, J. In this action the plaintiff seeks to recover damages from the defendant for the breach of an alleged contract.

The original declaration in substance alleged as follows: The defendant, in March, 1922, engaged the plaintiff to devote himself to the task of obtaining a suitable piece or parcel of land on the outskirts of New York City for the purpose of building and maintaining thereon a huge tank for the storing of fuel oil. In connection with the carrying out of this project

the plaintiff was also to obtain from the proper authorities of the city of New York a permit authorizing the use of the premises for the purpose of storing fuel oil thereon. In consideration of the services to be rendered by the plaintiff, the defendant agreed that, as soon as a suitable tract of land and a permit authorizing the storage of fuel oil thereon had been obtained, he would invest in the enterprise and engage in the business of selling fuel oil in New York city; that he would form a corporation, give the plaintiff twenty-five per cent of its common stock, which, he promised, would entitle the plaintiff to one fourth part of the profits. He also agreed to make the plaintiff a director of the corporation; that he would be otherwise permanently connected with the enterprise "at a salary of $15,000 per year and that his employment . . . [would] continue for a period of not less than five years." The declaration further alleged in substance that the plaintiff had carried out his part of the agreement and that the defendant had refused to perform his part. The answer and amended answer were a general denial, the statute of frauds, and payment.

The plaintiff was allowed to amend his declaration by the addition of two counts. Count two is a more specific statement of the alleged contract set out in count one. In substance it alleges an employment of the plaintiff for the term of one year at a salary of $15,000, the year "to start as of May 15, 1922." The amended declaration alleges in substance full performance of the contract on the part of the plaintiff and refusal to perform on the part of the defendant, a demand on the defendant for compliance with the contract and a discharge of the plaintiff. Count three is upon an account annexed, and alleges that "All of said counts are for one and the same cause of action."

"At the conclusion of the evidence the defendant filed separate motions that a verdict be directed for the defendant on each count in the plaintiff's declaration." These motions were denied, and to each denial the defendant saved an exception. "The jury was fully and appropriately instructed as to the rights of the parties and returned a verdict for the plaintiff . . . on the third count of the declaration." The

bill of exceptions contains all the evidence material to the issues raised.

Upon the reported evidence the jury would have been warranted in finding that in March, 1922, the plaintiff was employed by the defendant to assist him in the procurement of a site for the distribution, and a permit for the storage, of fuel oil in New York city; that at that time the defendant agreed to give the plaintiff $50 a week for expenses, which was satisfactory to the plaintiff; that the plaintiff and defendant went to Brooklyn, and on the way back to New York the defendant said "We will be partners in this enterprise . . . I am going to turn the Boston industries, the Ballard Oil Equipment Company, Ballard Oil Company of Boston into this New York company, and if you can get the permit, I can have an association with Matt Brush, who stands ready to put $300,000 into this company." On the testimony of the plaintiff the jury could warrantably have found that at this first interview the defendant offered the plaintiff $15,000 a year for five years as a salary, and an equal division of the stock the defendant was to have in the new corporation; that the five-year proposition remained open until about the middle of May, 1922, when the defendant said, "Mr. Reuter, I am only going to pay you $15,000 for one year, and if you wish to continue longer than that period, still longer, I will enter into a new agreement with you . . . . We will make another agreement, providing you obtain this permit in three or four weeks, and I will promise you that if you obtain this permit in three or four weeks, I will organize the company within one week thereafter and you will be the manager of the company." The evidence warranted the further findings that it was understood between the plaintiff and defendant that "this arrangement for the payment of $15,000 was to go into effect . . . immediately,— start on that day, and that the contract would be for one year only"; that the plaintiff replied to the above statement of the defendant, "I will go ahead with you on that basis"; and that the above described "arrangement" was entered into about three weeks prior to June 6, 1922, that is, on or about May 15, 1922, as the declaration alleges.

It was admitted at the trial that the plaintiff procured for the defendant an option of purchase of land, where a permit was granted on June 6, 1922, through the efforts of the plaintiff; that the land was desirable as a site, and that "an operable permit" meant a great deal, "a permit meant an awful lot to us." The defendant testified, in substance, that he discharged the plaintiff within a few weeks of the time he finished his work and told him he did not need him any more; that he did not erect the tanks, never took advantage of the permit, never made a return of the plans for approval or filed them with the fire department; that "we turned the whole proposition down . . . let the option go, until the whole thing lapsed." In response to the question what he intended to pay the plaintiff for obtaining the option and permit, he stated: "I expected to give him — depending upon the future; the profits that we made in the company. I expected to give him whatever I deemed was sufficient compensation for his work from time to time, and that, in my judgment, as it has in the past, rested with me, how I would take care of the employees of the company." He testified that the plaintiff's services were satisfactory up to the point where he found "sufficient reason" for discharging him, the reason being that the plaintiff had attempted to make a written "commitment" involving the company in the way of a guarantee of oil consumption which was enormous, and which the defendant refused to recognize, against the contention of the plaintiff that he was running the business, that he knew what he was doing and that he was going to mail the "commitment." He further testified that the conversation with and discharge of the plaintiff took place after the issuance of the permit; that before that time the plaintiff never made any commitments that would cause a breach between them; that the new corporation was formed after the issuance of the permit and Mr. Brush and Mr. Rockefeller were "in on it"; that instead of using oil from a terminal as proposed, they proceeded to buy oil from the Standard Oil Company and he abandoned the project of the option and permit entirely.

Disregarding the form of the amended declaration, a ver-

dict on the evidence could not rightly have been directed for the defendant. *Rubin* v. *Huhn,* 229 Mass. 126, 129. The motions for a directed verdict on counts one, two and three of the declaration respectively were denied rightly. Outside the issue of the period of employment, counts one and two are essentially the same, and there is no material variance between the allegations and proof which would warrant a new trial. Count three, being an action on an account annexed, was a proper form to use if the jury found, as they reasonably might have done on the evidence, that the contract was made by the defendant and that the terms of it were fulfilled by the plaintiff; but also found that, while the defendant agreed to pay the plaintiff for the services rendered by him in full performance of the contract, he did not agree to pay $15,000 a year or any definite sum. *Altman* v. *Goodman,* 255 Mass. 41, 43. The contention of the defendant, that no recovery on the third count could be had against him personally because he was known to the plaintiff to be acting for a projected corporation, nonexistent when the contract was made by the defendant and when it was fully performed by the plaintiff, is unsound. On the voluminous evidence the jury could have found warrantably that the contract was intended to bind some one, and if the projected corporation could not be bound, as it is clear it could not be, it was intended and understood that the defendant should be bound individually. *Hastings* v. *Lovering,* 2 Pick. 214, 221. *Abbott* v. *Hapgood,* 150 Mass. 248. *Bradford* v. *Metcalf,* 185 Mass. 205, 207. The defendant does not argue in his brief the defence of the statute of frauds which is set up in his answer to the original declaration. We assume that defence is waived. Without particularization we find no error in the admission or rejection of evidence which is sufficiently prejudicial to call for a new trial.

Passing from the consideration of the exceptions saved at the trial and hereinbefore considered, the defendant contends that the plaintiff can have no recovery against him because upon the undisputed facts the contract as made and performed was illegal and void as against public policy. If there is no dispute upon the facts, the question, whether a contract

or the performance of it is against public policy under all the circumstances attending it, is one which may be raised on a motion for a directed verdict. *Adams* v. *East Boston Co.* 236 Mass. 121, 127. An illegal contract, or the illegal performance of a legal contract, which is apparent upon undisputed facts will not be enforced in this court, although its illegality was not set up in the answer of the defendant, raised at the trial or noticed in the court where the plaintiff had a verdict. No court will consciously lend its aid for the enforcement of illegal contracts. *Claflin* v. *United States Credit System Co.* 165 Mass. 501, 503.

The facts upon which the defendant affirms as immediately giving proof of the charge of illegality are to be found in the alleged admissions of the plaintiff elicited on cross-examination, and in certain statements or declarations of fact and the inferences of fact which may rightly be drawn therefrom, contained in two letters from the plaintiff to the defendant. During the cross-examination referred to, the plaintiff was led to state the terms of the alleged contract which the defendant made or offered to make with him, namely, that it was the understanding that he was to receive $15,000 a year for five years for doing his best to get an option on the property and to get a permit, that he was to go ahead and use his best efforts to get the option and to get the permit and that he was to "do everything that was humanly possible to get it." In direct examination it appeared that before the final "arrangement" had been completed, and was accepted by the plaintiff, he asked the defendant when the contract for $15,000 a year was to be closed up, saying he had to have money, that the business was costing him a lot of money; and the defendant said: "You get the permit, and within a week after you get the permit the company will be organized and you will get your money." During the cross-examination the plaintiff, in substance, said the defendant told him at their first talk about the contract subsequently made that "if he [the defendant] could land that permit, or if . . . [the plaintiff] could land that permit, or if . . . a permit could be landed," the future of the plaintiff was assured; that the defendant would make him manager of the company that

was going to be formed and his pay would be $15,000 per year for five years; and that the plaintiff said: "That is all right. That sounds good"; that it was the under-standing that he was to receive that sum of money for doing his best to get an option on the property, and get the permit. He further testified that in his efforts to get the permit "he had dozens of conferences with various people in connection with the city government, as Fire Chief Martin and with Mr. Cronin, a prominent citizen on the New York Realty Board, and . . . his conferences may have run into hundreds, but he would [not] be positive, including lunches which he had with members of the board." In direct examination he testified that to get the permit he had to present plans and specifications of the proposed plant to the board of fire prevention and was told he would have to obtain permission from the board of standards and appeals; that he saw the chairman of that board, Mr. Walsh, and was told that asking for the storage of forty thousand barrels of oil in New York City was unreasonable and he did not think a permit would be granted; that he explained to Walsh the manner in which he proposed to put the storage plant in and after consultation with the acting Fire Chief "Smoky Joe" Martin, who visited the site of the proposed plant with him, was told that probably a permit would be granted.

In a letter dated April 12, 1922, which was about one month before the date of the final arrangement on May 15, 1922, the plaintiff wrote the defendant as follows: "I called the chief's attention to the heavy cost of delay to us, in reply to which he mentioned that we are working considerably ahead of the ordinary schedule and in his opinion we are getting along very rapidly. He figured that an examination in from ten days to two weeks is going good. We got the examination through in one week from the date of filing the application, five days of which were rainy days. The Chief and his Lieutenants are showing a willingness to 'play the game' with us, and knowing 'their game', as I do, it does not behoove us or anyone else to trying 'crowding' too hard. From my observation and experience I would say the Fire Prevention Bureau is going good. While we all know that

this matter must be brought up to the Board of Standards and Appeals, there is a difference in the manner in which it is brought up, viz: whether we have the Fire Prevention bureau or against us.  As the matter stands we have them with us."

On June 2, 1922, he wrote the defendant the following letter: "I am sorry to advise you that an extremely annoying incident has come up in connection with our application for permit.  Today Mr. Walsh, Chairman of the Board of Standards and Appeals, telephoned this office to say that he had found that certain outside political pressure was being brought to bear to expedite the favorable action of his board. Mr. Walsh went on to say that if he was convinced that politics were being injected into the situation, he would flatly turn us down.  Mr. Walsh mentioned the name of Mr. McGarry in his conversation.  By a seeming coincidence Mr. McGarry was sitting in this office when Mr. Walsh telephoned.  I wish to state emphatically that I have no knowledge of the influence at work to which Mr. Walsh refers. You will distinctly remember my repeated statements that this entire matter was proceeding as smoothly and as quickly as could well be expected and above all I asked that no further efforts be made to pull outside wires.  In the face of that it comes as a distinct shock to find that someone else has been interfering in a matter over which I have been given complete charge and control by you.  I will use every endeavor to offset the damaging effect of this latest development."

The plaintiff and defendant on June 5, 1922, the night before the permit was granted, had a conversation with reference to the letter of June 2, which is described in the record as follows: The plaintiff said: "'Mr. Ballard, we are in jeopardy with this permit, because outside influences have been injected into this, and it appears that Mr. McGarry went down there and tried to use political influence to put this permit across, and other things have come up in the way of a probable petition circulated to have the petition denied, to which I paid considerable time and attention to offset and stop.  I talked with Mr. Walsh on this subject; assured him

that it was no doings on my part; and it was unsolicited, and in the face of that talk Mr. Walsh said he would again be open minded.' That Mr. Ballard then said, 'Mr. Reuter, I must have that permit. You get that permit tomorrow, by all means, and my contract with you commences on May 15 for one year, and I will give you half of my stock in the new corporation which will be formed in about a week, if you get that permit tomorrow.'"

Giving full weight to the contentions and arguments of the defendant, we do not find in the contract anything beyond suspicion that the parties to it contemplated that the plaintiff, to obtain the permit, should resort to the use of corrupt action or should exert any outside influence upon the members of the several boards which would impair or have a tendency to destroy their honest judgment and thereby procure a decision which would not be the result of sober examination and sincere conviction that the public interest and utility would be conserved or furthered by the grant of the permit. In a word, there is nothing in the contract which imports that the plaintiff, if necessary, was to attempt to procure the permit through secret, improper and corrupt means. Passing from the contract itself to the performance of it, the undisputed facts show neither corruption of members of the board nor attempted improper tampering with municipal board action. We have considered with care the statements of the rules of the common law applicable to the matter at issue, as such are defined in the following cases cited for the defendant. *Fuller* v. *Dame*, 18 Pick. 472. *Noble* v. *Mead-Morrison Manuf. Co.* 237 Mass. 5, 21. *Egerton* v. *Brownlow*, 4 H. L. Cas. 1. *Mills* v. *Mills*, 36 Barb. 474. *Trist* v. *Child*, 21 Wall. 441, 450.

The motion for a directed verdict for the defendant was denied rightly.

*Exceptions overruled.*