## C. W. HART AND OTHERS v. M. J. BELL AND OTHERS.[1]

No. 34,155.

May 31, 1946.

[1]Reported in 23 N. W. (2d) 375, 24 N. W. (2d) 41.

70

*Louis H. Joss* and *M. E. Culhane,* for plaintiffs in the trial court.

*Henry M. Gallagher, Robert Sheran, L. E. Melrin,* and *Louis H. Joss,* for appellants in supreme court.

*James E. O'Brien* and *Kimball B. DeVoy,* for respondents.

MATSON, JUSTICE.

Plaintiffs, all stockholders, appeal from an order denying their motion for a new trial.

Plaintiffs Ivan B. Romig and C. W. Hart and one George S. Koffend in 1931 organized the Sports Afield Publishing Company, a Minnesota corporation, for the publication of a magazine known as *Sports Afield.* The new corporation, hereinafter called Sports Afield, issued four classes of stock, namely, (1) common stock with voting rights, (2) class A nonvoting common stock, and (3) two classes of preferred stock with no voting rights unless and until dividends thereon remained unpaid for three consecutive years. In October 1931, to obtain more corporate capital, M. J. Bell, one of the defendants, was induced to invest $10,000 in stock.

By June 1, 1934, Bell, C. W. Hart, and Romig each owned 258 shares of common voting stock and Koffend 216. Six additional outstanding shares were owned by others. On this date, Bell also owned considerable second preferred stock, for which he had paid $15,000 in cash and had cancelled an additional $20,000 in loans to the corporation. C. W. Hart, The Hart Company, and Romig owned in the aggregate over 600 shares of second preferred. Bell, C. W. Hart, The Hart Company, and Romig owned certain class A common stock but no first preferred.

On June 1, 1934, and for a long time prior thereto, Sports Afield was insolvent and unable to pay its liabilities as they became due. A cessation of publication of the magazine was imminent because of inability to pay the long past-due bill for printing. Romig and C. W. Hart requested Bell to lend additional money to Sports Afield, but he flatly refused unless he were permitted to acquire

enough common stock to give him absolute and permanent control. About the middle of June 1934, Bell, Hart, and Romig entered into an oral agreement whereby sufficient common stock was transferred by Romig to Bell to give him control. This agreement, reduced to writing by Romig and signed by him and Bell, contained the following provisions:

"It Is Therefore Agreed by M. J. Bell that he personally and through the Bell Lumber and Pole Co., of which he is majority stockholder, will see Sports Afield through by providing funds, credit or loans to Sports Afield Publishing Company.

"It Is Further Agreed by the three undersigned parties hereto *that no dividends shall be declared or paid by Sports Afield Publishing Company until any such loan or loans received from M. J. Bell or the Bell Lumber & Pole Co. have been paid* or unless special permission of the above creditor or creditors is given for any such payment of dividends while such loan or loans are still unpaid." (Italics supplied.)

Pursuant to the aforesaid agreement, Bell, or the Bell Lumber & Pole Company, advanced between June 20, 1934, and November 12, 1935, cash loans totaling $50,500. By April 25, 1945, the loans plus interest had increased to over $84,000. During the fiscal years from 1931 to 1938, Sports Afield showed an operating loss as high as over $60,000 a year and never less than $13,794.11. In 1939, a profit of $402.45 was shown. The years 1940 and 1941 each showed operating losses in excess of $3,300. In 1942, 1943, and 1944, operating profits were shown in the respective sums of $1,786.57, $32,330.27, and $79,780.75. At the end of the 1944 fiscal year, the total accrued operating losses amounted to $293,944.36 as against a total accrued operating profit of $114,300.04.

With Bell in control, Walter F. Taylor, a trusted employe of the Bell Lumber & Pole Company and upon whom Bell had for many years relied for financial advice, was elected to the board of directors and made treasurer of Sports Afield. Romig was continued in office as publisher and general manager until 1940, when

Taylor succeeded him. Romig was retained as secretary until November 1, 1937, when this post was given to Taylor. Hart, Romig, Taylor, and Bell at all times pertinent herein served as directors. Ever since October 1934 Bell has been president.

On October 20, 1936, the corporate control acquired by Bell by the transfer to him of 250 shares of stock by Romig was jeopardized through the failure of Sports Afield to pay dividends for three consecutive years to the holders of the preferred stock whereby they acquired the right to vote. For the purpose of continuing Bell in control, a voting trust agreement was then entered into by C. W. Hart, I. E. Hart, R. D. Hart, The Hart Company, Romig, and Bell, whereby Taylor, as trustee, was given the possession and the right to vote 260 shares of common stock and 200 shares of preferred stock owned by the Harts and The Hart Company until such a time as the default in dividends should be removed so as to deprive the preferred stock of voting power, but in no event was the voting trust to continue beyond 15 years.

In 1932, Koffend had loaned Sports Afield $5,000 upon a promissory note. Koffend died in October 1936, and shortly before or after his death this note was acquired by the Venus Manufacturing Company, together with an open account from Sports Afield in the amount of $450, together with 48 shares of preferred stock and 216 shares of common stock. Payment of the note was demanded in 1936. Suit was threatened. The corporation was insolvent and unable to make payment or effect a settlement. Bell, who was then a director and also president of Sports Afield, was requested to negotiate for terms. An offer of $6,100 to be paid in monthly installments was refused by the Venus Manufacturing Company because Bell refused to guarantee this obligation of Sports Afield personally. Romig asked Bell to purchase the note, the open account, and the stock for himself and for his own use and benefit, but Bell in turn suggested that Romig or C. W. Hart purchase the same for their own individual benefit. Neither Romig nor Hart was financially able to make the purchase. Bell thereupon, in order to stave off the suit and to protect the corporation as well as

his own interest, bought the note, the open account, and the stock for his own individual use and benefit.

Plaintiffs sued (and tried the case below) on the theories: (1) That Bell should be ordered to return the 250 shares of stock transferred to him by Romig, because of an alleged "inside deal" or agreement to the effect that Bell was to retain said stock for control purposes only until the money he had advanced Sports Afield was repaid; (2) that Bell had in bad faith and unreasonably and arbitrarily by his alleged control of the board of directors prevented Sports Afield, though financially able to do so, from repaying the indebtedness to him and that repayment should now be made; (3) that the 1936 voting trust agreement should be reformed because of oversight or mutual mistake in failing to provide for its termination upon repayment of the indebtedness to Bell; (4) and that the Koffend note, open account, and stock acquired by Bell were in fact acquired for the use and benefit of Sports Afield and should be adjudged to be the property of Sports Afield subject to Bell's right to reimbursement for the actual amount he had paid therefor. The trial court by its findings, which are all reasonably sustained by the evidence, determined all these issues in favor of defendants, and specifically found that Bell had, in all his corporate activities and transactions, acted in good faith and to the best advantage and interest of Sports Afield and its stockholders.

■ Upon this appeal, plaintiffs have abandoned the theories upon which the case was tried below and have shifted to the theory of illegality. As a general rule, litigants are usually bound in this court by the theory or theories, however erroneous or improvident, upon which the case was actually tried. Skolnick v. Gruesner, 196 Minn. 318, 324, 265 N. W. 44, 47. As an exception to this general rule, this court has a duty to, and upon its own motion may, consider and determine a case upon the ground of illegality, although such ground was neither presented to nor considered by the trial court, if such illegality (a) is apparent upon undisputed facts, (b) is in clear contravention of public policy, and (c) if a decision thereon will be decisive of the entire controversy on its merits.

The illegality, to be given consideration for the first time upon appeal, must appear from clear and undisputed facts established by such findings of the trial court as are reasonably sustained by the evidence, or which appear from the undisputed terms of an agreement or transaction upon the validity of which the entire cause rests, or which appear from the pleadings or other undisputed and unambiguous evidence. It is not the function of this court to search the record, to weigh the evidence, and to make new findings of fact upon which to build a factual foundation for a determination of illegality. It is an elementary and basic requirement of all just procedure that before a litigant, in the interest of the public welfare, is deprived of rights he claims to exist, caution should be exercised to insure that he has not been, and will not be, thereby denied an opportunity to present his case with respect to illegality. It must appear that such litigant has "no cause of action or a defense." See, Craig v. Baumgartner, 191 Minn. 42, 46, 254 N. W. 440, 442; Skolnick v. Gruesner, 196 Minn. 318, 324, 265 N. W. 44, 47; Reuter v. Ballard, 267 Mass. 557, 562, 563, 166 N. E. 822, 825; Baskin v. Pass, 302 Mass. 338, 342, 19 N. E. (2d) 30, 32; Sullivan, Inc. v. Cann's Cabins, Inc. 309 Mass. 519, 521, 36 N. E. (2d) 371, 372, 136 A. L. R. 1236; 2 Pirsig's Dunnell, Minn. Pleading, § 1306, p. 822.

The element of illegality must also be of such a nature that to enforce or recognize a transaction tainted thereby would be clearly contrary to the public policy and welfare. Not every illegality requires intervention for the preservation of public policy. For example, a violation of the manifold specifications of a modern building ordinance was held by the Massachusetts supreme court not to require such intervention where the defendant had received the benefit of a well-constructed building erected substantially in accordance with the building contract. See, Morello v. Levakis, 293 Mass. 450, 452, 200 N. E. 271, 273. It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands.

Twin City Pipe Line Co. v. Harding Glass Co. 283 U. S. 353, 51 S. Ct. 476, 75 L. ed. 1112, 83 A. L. R. 1168; Baltimore & Ohio S. W. Ry. Co. v. Voigt, 176 U. S. 498, 20 S. Ct. 385, 44 L. ed. 560; Bartron v. Codington County, 68 S. D. 309, 2 N. W. (2d) 337, 140 A. L. R. 550; 5 Williston, Contracts (Rev. ed.) § 1630A; 12 Am. Jur., Contracts, § 172. See, 1 Dunnell, Dig. & Supp. § 401.

"* * * the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." Cole v. Brown-Hurley Hardware Co. 139 Iowa 487, 491, 117 N. W. 746, 748, 18 L.R.A.(N.S.) 1161, 16 Ann. Cas. 846. Quoted with approval in Hollister v. Ulvi, 199 Minn. 269, 280, 271 N. W. 493, 498-499.

Assuming that the elements of *contravention of public policy* and *undisputed facts* are present, a decision will be based on illegality, though the issue is raised for the first time on appeal, if such decision is decisive of the entire controversy on its merits. Skolnick v. Gruesner, 196 Minn. 318, 324, 265 N. W. 44, 47; C. M. & St. P. Ry. Co. v. Sprague, 140 Minn. 1, 5, 167 N. W. 124, 126.

In applying the foregoing three-phase test to the instant case, we have, outside of the findings of the court, practically nothing before us in the way of undisputed facts except the contract of 1934, pursuant to which Bell acquired control. This contract contains a specific provision "that no dividends shall be declared or paid" until the loans to Bell and his lumber company have been paid. It is plaintiffs' contention that this provision divests the directors and officers of their right and duty to exercise independent judgment and discretion in determining corporate policy and action (with specific reference to dividends) and is therefore illegal and void. Where there is a choice between a construction of illegality and one of legality, in the absence of proof of a purpose to the contrary, an intended contractual course of legality is to be presumed. Hollister v. Ulvi, 199 Minn. 269, 280, 271 N. W. 493, 498. These contracting stockholders did not stipulate for the election of dummy

directors to act as they were told with respect to dividends or any other corporate matter. It is of no significance that they were in a position to elect, and that they subsequently did elect, themselves as directors. They were not acting as directors when the contract was made. Their statement "that no dividends shall be declared or paid," in the absence of a further provision implementing an intent of performance through a dummy directorate, is reasonably to be construed as merely a declaration of desirable corporate policy. It would be a narrow, as well as an absurd, construction to impose upon the parties an intent to use unlawful means for achieving a justifiable objective when lawful means were available. Bell, Romig, and C. W. Hart (and in fact Bell alone) controlled a majority of the common stock and were therefore in a position to elect directors friendly to corporate policies in which they believed without making any effort to throttle their official discretion. Must we assume that a contract to do lawful acts is unlawful? Justice Holmes, as chief justice of the Massachusetts supreme court, in considering the legality of a contract by certain stockholders to vote as a unit at three consecutive annual corporate meetings for a board of directors nominated by a certain committee, aptly said:

"* * * The question before us is not whether it would be possible to carry out the contract in a way which would have made the contract bad if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. We put the question in this form because there is no doubt that the subscribers might actually have done the things stipulated without giving any one a right to complain. That is to say, they might have held their stock and voted by previous understanding according to the advice of the committee, as long as they chose. The question is what they might contract to do; for this is supposed to be a case where a contract to do lawful acts is unlawful." Brightman v. Bates, 175 Mass. 105, 110, 55 N. E. 809, 810.

Absent illegality upon the undisputed facts, we need not here proceed to an application of the other elements of the three-phase test.

3. The practical conduct of a modern business corporation compels a frank recognition that "an agreement by a number of stockholders to combine their votes in order to effectuate a particular policy is not of itself unlawful in the absence of evidence of an intent to defraud the other stockholders or to secure a private benefit at the expense of the corporation or the other stockholders." 66 U. S. L. Rev. (1932) pp. 562, 566. Illegality per se is no longer the inevitable consequence of every agreement by a majority of the stockholders without regard to its purpose or effect.[2] In Mackin v. Nicollet Hotel, Inc. (8 Cir.) 25 F. (2d) 783, 786, the court said:

"* * * The old theory which seemed to dominate the earlier writers, to the effect that every stockholder in a corporation is entitled to have the benefit of the judgment of every other stockholder in the selection of a board of directors, has necessarily been rendered obsolete because of our modern business being conducted by large corporations with thousands of stockholders located in all parts of the country. Manifestly a meeting of the stockholders of such corporate organizations would be not only impracticable but impossible."[3]

In Manson v. Curtis, 223 N. Y. 313, 319, 119 N. E. 559, 561, Ann. Cas. 1918E, 247, the New York court of appeals said:

"It is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a

[2]See, Brightman v. Bates, *supra;* Trefethen v. Amazeen, 93 N. H. 110, 111, 36 A. (2d) 266, 267; White v. Snell, 35 Utah 434, 100 P. 927; Thompson v. J. D. Thompson Carnation Co. 279 Ill. 54, 116 N. E. 648, Ann. Cas. 1917E, 591; Venner v. Chicago City Ry. Co. 258 Ill. 523, 101 N. E. 949; Smith v. San Francisco & N. P. Ry. Co. 115 Cal. 584, 47 P. 582, 35 L. R. A. 309, 56 A. S. R. 119; 21 Minn. L. Rev. 103; 66 U. S. L. Rev. 562, 566, and cases cited; 5 Fletcher, Cyc. Corp. (Perm. ed.) § 2064, pp. 194-196; 13 Fletcher, Cyc. Corp. (Perm. ed.) § 5743, pp. 48-49.

[3]See, Carnagie Trust Co. v. Security L. Ins. Co. 111 Va. 1, 20, 68 S. E. 412, 418, 31 L.R.A.(N.S.) 1186, p. 1195, 21 Ann. Cas. 1287.

course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement, among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Shareholders have the right to combine their interests and voting powers to secure such control of the corporation and the adoption of and adhesion by it to a specific policy and course of business. Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object."

In the instant case, there is a complete absence of evidence of any intent to defraud the other stockholders or to secure a private benefit at their expense or that of the corporation. If Sports Afield had failed for lack of funds, everybody would have suffered a loss without exception. Bell's money, as well as his leadership in securing the adoption of new policies, including that of discouraging the improvident payment of dividends before debts had been paid, brought benefits to all stockholders without discrimination, as well as to the corporation.[4]

■ Instead of using profits for the payment of dividends, it is within the sound discretion of corporate management, in the exercise of honesty and good faith, to devote profits to the gradual retirement of debts. See, 13 Am. Jur., Corporations, § 677, p. 677; 1 Spelling, Private Corp. § 445; 2 Dunnell, Dig. & Supp. § 2072.

[4]Jacobson v. Barnes, 176 Minn. 4, 222 N. W. 341, involving a stockholder's contract guaranteeing permanent employment to one of the parties as a corporate officer, and Seitz v. Michel, 148 Minn. 80, 181 N. W. 102, 12 A. L. R. 1060, involving a similar guarantee of employment as well as a direct misuse of the corporate charter, illustrate contracts tainted with illegality in contravention of public policy, in that their effect or intent was to accomplish a private gain at the expense of the corporation and the other stockholders. See, Lindgrove v. Schluter and Co. Inc. 256 N. Y. 439, 176 N. E. 832; 17 Minn. L. Rev. 89.

In view of what we have already held herein, no purpose will be served in discussing the 1936 voting trust agreement, which plaintiffs allege to be illegal as constituting a part of the 1934 transaction. It was drawn in substantial compliance with Minn. St. 1941, § 301.27 (Mason St. 1940 Supp. § 7492-26). See, 17 Minn. L. Rev. 700, 22 Minn. L. Rev. 276, and 24 Minn. L. Rev. 347.

Much has been made by plaintiffs of the testimony of Bell, as constituting an admission that he required as a condition to his loaning to Sports Afield of more money a binding agreement that Taylor, his trusted financial adviser, should be made a director and elected treasurer. This testimony can hardly be considered so undisputed as to constitute a base upon which to predicate a consideration of illegality. It should be weighed and considered in the light of the evidence presented by the record as a whole, and that is not our function. We note, however, that if we take Bell's testimony in the light most favorable to plaintiffs' contention, there is, nevertheless, no indication of illegality. There was neither a guarantee of employment to Taylor for any definite period nor a guarantee of salary. He was not saddled upon the corporation for better or for worse. He was subject to removal by the majority stockholders. Neither as a director nor as an officer was he deprived of the right and duty to exercise independent judgment. In short, we have a situation that is entirely different from that in Jacobson v. Barnes, 176 Minn. 4, 222 N. W. 341, and Seitz v. Michel, 148 Minn. 80, 181 N. W. 102, 12 A. L. R. 1060. (See, footnote 4, *supra*.) Bell as a majority stockholder, in the exercise of his own judgment, was free to elect Taylor, or any other person, a director. His statement that he would insist upon placing Taylor in a position of corporate responsibility if he were given control was, as already indicated, nothing more than a frank declaration of the policies which he proposed for the future guidance of Sports Afield.

Plaintiffs contend that Bell, as an officer and director, violated a fiduciary duty in purchasing the Koffend note, stock, and open account for himself, and that as a matter of law the benefits of the transaction belonged to the corporation. The trial court,

whose findings are reasonably sustained by the evidence, specifically found that:

"Throughout the negotiations for the settlement of the claim made on the Koffend note and the open account, M. J. Bell acted in good faith and made every effort to obtain the possible benefits thereof for the corporation. By reason of its financial condition, the corporation was unable to make the purchase or settle the claim for its own benefit, and the Venus Manufacturing Company refused to deal with the corporation on anything but a cash purchase, which the corporation was unable to make. In good faith, M. J. Bell made the opportunity available to the other directors who were unable and unwilling to make the purchase. Finally M. J. Bell, for the purpose of saving the corporation from a lawsuit and, perhaps, a potential receivership, and to protect his own investment therein, in good faith, made the purchase on his own behalf and for his own use and benefit, and paid therefor with his own money."

Obviously, Bell's obligation to finance Sports Afield under the 1934 contract was limited to the reasonably immediate financial crisis that then existed and did not extend to all future emergencies. Neither in his capacity as a party to the 1934 contract nor in his capacity as an officer or director was he obligated to assist the corporation with his personal funds to meet its liabilities in 1936. He was under no specific duty to acquire the stock for the corporation by using his own funds or by personally guaranteeing Sports Afield's obligations. 3 Fletcher, Cyc. Corp. (Perm. ed.) § 862. Sports Afield was insolvent and unable to take advantage of the "corporate opportunity" to settle the Koffend note and purchase the Koffend stock. An officer or director is under a fiduciary obligation to exercise his powers solely for the benefit of the corporation and its stockholders so as not to divert a "corporate" business opportunity to his own use and benefit. Where the opportunity is not "corporate," but "personal," such opportunity belongs to the officer, and he may treat it as his own. The principles which determine whether a business opportunity is "corporate" or "per-

sonal" have been clearly set forth by this court in Diedrick v. Helm, 217 Minn. 483, 494-496, 14 N. W. (2d) 913, 919-920, 153 A. L. R. 649, and no purpose will be served in repeating them here at length. Suffice it to say that under the foregoing decision a business opportunity ceases to be a "corporate opportunity" and becomes "personal" when the corporation is definitely no longer able to avail itself of the opportunity. The inability to avail itself of a business opportunity may arise from financial insolvency, as here, or from legal restrictions, or from any other factor which prevents it from acting upon the opportunity for its own advantage. Here, the opportunity to buy the Koffend note, open account, and stock was not "corporate" and did not belong to Sports Afield, in that it was wholly incapable financially of availing itself thereof. The opportunity was "personal," and Bell acted lawfully in making the purchase for his own individual benefit. Furthermore, it is to be noted that he acted at all times with the best of good faith in all his transactions for the benefit of the corporation. See, Diedrick v. Helm, *supra,* and cases cited therein on p. 494, 14 N. W. (2d) p. 919; 3 Fletcher, Cyc. Corp. (Perm. ed.) § 862; 2 Dunnell, Dig. & Supp. § 2096.

The order of the trial court denying a new trial is affirmed.

Affirmed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On July 5, 1946, the following opinion was filed:

PER CURIAM.

Plaintiffs (appellants) appeal from the clerk's taxation of costs and disbursements awarded to defendants (respondents).

Plaintiffs contend that the disbursement item of $224.70 for printing the supplemental record should be disallowed on the theory that such record covered only facts pertaining to issues from which no appeal had been taken. We cannot agree. On appeal, plaintiffs proceeded on the theory that this court should sift and weigh the evidence for the purpose of making new findings of fact as a foundation for a determination of illegality. Although their theory

was not adopted by this court, nevertheless defendants were justified in printing a supplemental record to present evidence which would have been necessary in rebuttal had plaintiffs' theory been adopted. Plaintiffs, who seek to prevail upon a theory that is rejected by this court, cannot thereafter be heard to complain when defendants are allowed their necessary disbursements for the printing of a brief and a supplemental record, both of which were reasonably necessary to controvert and refute such theory and the assignments of error thereunder.

We find, however, that defendants unnecessarily included in the supplemental record certain photostatic copies of exhibits A-57, A-58, A-59, and A-60, as well as certain financial statements, the substance of which could have been summarized, thereby reducing the pagination. Neither was it necessary to print a photostatic copy of defendants' exhibit 7, since this had already been printed.

By reason of the unnecessary inclusion of the specified items, a deduction of $45 in the amount of the disbursements is ordered. This deduction shall be made by allowing defendants the sum of only $179.70 for the printing of the supplemental record. See, 2 Dunnell, Dig. & Supp. § 2239.

With the exception of the $45 deduction, the clerk's taxation of costs and disbursements is affirmed.