WESTLAND CAPITOL CORPORATION,
et al., Respondents,

v.

LUCHT ENGINEERING INC., et
al., Appellants.

No. 51462.

Supreme Court of Minnesota.

July 24, 1981.

Joe A. Walters, Frederick W. Morris, O'Connor & Hannan, Minneapolis, for appellants.

Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, for respondents.

SIMONETT, Justice.

Two investors in a close corporation went to court to enforce a restriction in their loan agreement which prohibited company purchase of any fixed assets, here an airplane, costing over $25,000 annually. The district court held the prohibition to be enforceable. The corporation and its president appeal. We affirm.

Orren Lucht incorporated his photofinishing equipment business in 1971. By 1975 his company, Lucht Engineering, Inc., was seriously in debt, primarily because of development costs for a new photo printer. Creditors were unpaid, payroll taxes unmet. Survival of the company was in grave doubt without an immediate infusion of capital. Lucht already had pledged a second mortgage on his house and the banks were of no help. One venture company offered financing, but only in return for a majority interest in the company, a course Lucht rejected.

Lucht then turned to two California venture capital firms, Westland Capital Corporation and Community Investment Enterprises, Inc., the former being licensed by the Small Business Administration. Westland and Community Investment made a careful investigation of Lucht's business and decided each would invest $62,500, a total of $125,000. For this sum Lucht Engineering issued to the investors its convertible debentures, payable by 1982, bearing interest at 4½% over prime. Each lender could convert up to $20,000 of its debt into common stock of Lucht Engineering.

As further inducement for the loan, on December 15, 1975, Lucht Engineering also entered into an agreement with the two capital investment firms. This loan agreement, among other things, provided that Lucht Engineering would put a representative of each firm on the five-member board of directors; that the company would not declare or pay dividends or otherwise distribute property to shareholders; that the company would not hire any new employees for more than $18,000 a year nor increase the salary of any current employee receiving $18,000 a year more than 10% annually; that the company would not lend money nor make investments except those issued or guaranteed by banks or the federal government; and that the company would not acquire fixed assets for which it paid or became obligated to pay over $25,000 annually. It is this last proviso that is at issue here.

The loan agreement provided that these restrictions would continue in force even

after retirement of the debentures and for so long as either lender owned at least 50% of the common stock it was entitled to obtain under the agreement. Lucht objected to this provision but it was insisted upon by the investors as one of the terms for making the loan. Lucht, however, was not required to personally guaranty the debentures.

Lucht Engineering also agreed to hire both Westland and Community Investment as consultants at a monthly compensation of $125 each. The loan agreement was binding on the successors and assignees of the parties. It was approved by resolution of the board of directors of Lucht Engineering and signed by Orren Lucht as president. At the time Lucht was the sole shareholder of Lucht Engineering, but he did not sign the loan agreement in that capacity.

With the loan, Lucht Engineering was able to develop and market its printer. The fortunes of the company improved dramatically. From a business employing 25 people, it quickly grew to 85 employees. A substantial loss in 1975 was turned around so that in 1979 the company had a profit of $400,000. Sale of the printer accounted for about 80% of all income. Business was so good that the company elected to redeem all the debentures in 1978, 4 years early, thus saving on the high interest expense.

At the time of redemption, in the summer of 1978, Westland and Community Investment both exercised their full conversion privileges, each taking $20,000 of common stock. This gave each lender an 18% stock interest in Lucht Engineering. Orren Lucht thus held approximately a 60% stock interest with the remaining stock being held by a third party to whom Lucht had sold a few shares. (The third party chose not to intervene in this suit and her position on the issues here is unknown.)

Until the fall of 1978, the parties apparently had worked together amicably. By then, Orren Lucht, who had been taking flying lessons, had obtained his pilot's license. He wanted a plane for both personal and business use, but did not care to pay for it himself and instead proposed to the board of directors that the company buy it. The plane he wanted cost over $50,000. James Goetz and Donald Soukup, the representatives of Westland and Community Investment on the board, objected. They argued it was too dangerous for a key man in the company to fly small planes, that the purchase was unnecessary and would give the company a bad image, and that it was a personal benefit or dividend to Lucht. They reminded the board the purchase would violate the loan agreement restriction against purchase of fixed assets costing over $25,000. As an alternative, they suggested Lucht buy the plane himself and have the company reimburse him for business use. Lucht countered that the tax consequences were better for him if the company bought the plane and that the plane was an appropriate company investment. The board of directors voted 3 to 2 to purchase the plane, Lucht, his wife and his business manager outvoting Goetz and Soukup.

After the vote, Lucht assured the two dissenters he was still considering alternatives to company purchase and that he would inform the board before the company bought a plane. Fearing his mind was made up, Westland and Community Investment moved for a court order restraining company purchase of the plane, but when it came time for the hearing on the motion, Lucht admitted the company had acquired the plane 2 days before. Westland and Community Investment then asked for an order directing Lucht Engineering to sell the plane. Lucht Engineering counterclaimed, seeking a judicial declaration that the germane term of the loan agreement was void. After trial, the court granted respondents Westland and Community Investment their requested relief. Acting *sua sponte*, the court also ordered Orren Lucht to reimburse the corporation for monies lost on the transaction. Lucht Engineering's appeal is from the denial of its motion for a new trial.

1. Appellants first contend the loan agreement is illegal because it violates the Minnesota Business Corporation Act, Minn.

Stat. ch. 301 (1980), and public policy. (The new Minnesota Business Corporation Act, enacted by the 1981 legislature, is not before us.) So long as the debentures were outstanding, appellants agree the loan agreement and its restrictions constituted a valid, binding agreement. But they argue that once the loan was paid, once the loan agreement had served its purpose, it was no longer enforceable.

Appellants quote Minn.Stat. § 301.28, subd. 1 (1980): "The business of a corporation shall be managed by a board of directors * * *." They contend this mandate is defeated by the loan agreement which restrains the board of directors "in perpetuity" from managing the corporation's business by majority vote. In effect, they say, the loan agreement unlawfully delegates ultimate managerial authority to a minority stock interest. They claim this also offends public policy.

Appellants cite *Ray v. Homewood Hospital*, 223 Minn. 440, 27 N.W.2d 409 (1947), and *Seitz v. Michel*, 148 Minn. 80, 181 N.W. 102 (1921). In *Ray*, a party promised not to take part in the management of a hospital if elected to the board of trustees; the promise was declared void on public policy grounds. In *Seitz*, an agreement between stockholders that one would be employed by the corporation for life was declared void. In both cases, the court denounced agreements which suspend. the judgment of the board of directors.

These cases, however, are not dispositive. *Seitz* was written before voting trusts and shareholders' agreements became well accepted and close corporations became recognized as *sui generis*. In *Seitz*, too, a private gain at the expense of the corporation was conferred on the party granted lifelong tenure. In *Ray*, the person agreed to be a nonentity on the board of trustees, to take no part in management, which is not the case here.

We are dealing here with the special case of a close corporation, which has been described as a partnership in corporate guise. The shareholders are usually active in the business, serving as directors, officers and employees, and they are wary of stock transfers which allow strangers a voice in company policy. Usually, no market exists for the stock, at least for a minority interest, and dividends are seldom distributed. Instead, shareholders derive their income mainly from salaries and perquisites. *See generally* F. O'Neal, 1 *Close Corporations* § 1.07 (2d ed. 1971). For their part, minority shareholders are in a vulnerable position, since the majority can deny them income by refusing to employ them or pay dividends. Legal remedies exist for alleviating abuse of minor interests, *see* Minn.Stat. § 301.-49(3) (1980), but this is a costly, uncertain process available only in extreme cases. Another protective measure, the use of a voting trust, is typically ineffective because minority stock interests may amount to less than 50%, even when united.

What have developed instead are shareholders' agreements in the form of charter provisions, bylaws or contracts *inter se*. These agreements usually are demanded by investors at the time they buy into the corporation. Their most common features are the right to limit or veto salary increases and employment decisions and the right to some control over dividend declarations. *See Galler v. Galler*, 32 Ill.2d 16, 27–28, 203 N.E.2d 577, 583–84 (1964); O'Neal, *supra*, §§ 3.57, 5.02; Hornstein, *Stockholders' Agreements in the Closely Held Corporation*, 59 Yale L.Rev. 1041 (1950); *see generally* Field, *Resolving Shareholder Disputes and Breaking Deadlocks in the Close Corporation*, 58 Minn.L.Rev. 985 (1974). Although at one time these agreements were struck down for unlawfully impinging on the statutory authority of corporate directors, the trend has long been to uphold them. O'Neal, *supra*, § 5.06. We note the new Minnesota Business Corporation Act, effective July 1, 1981, recognizes these agreements as lawful means for control of corporate affairs. 1981 Minn.Laws, ch. 270, §§ 26, 76.

Appellants correctly point out the loan agreement here is not an agreement among the shareholders. Community Investment and Westland were creditors, not sharehold-

ers, when they signed. Lucht only signed in his capacity as corporate president, not as a shareholder. Nevertheless, the trial court treated the loan agreement as if it were a shareholders' agreement. We believe this was correct, for the basic realities are the same. Lucht was the sole shareholder at the time the agreement was entered into and both he and the board of directors which he controlled negotiated and approved the agreement. On their part, Westland and Community Investment were, at the time of the loan agreement, inchoate shareholders, since they had the right to convert a portion of their debt into a minority stock interest. Indeed, they had a greater interest in enforcing the restrictions as shareholders than as creditors, for it was as shareholders with an equity interest that they would realize their profits.

In *Hart v. Bell*, 222 Minn. 69, 23 N.W.2d 375 (1946), a voting trust was challenged as void for public policy reasons by a group of shareholders in a close corporation. After observing that the practical conduct of a modern business corporation compels a recognition that a number of shareholders may combine their votes to carry out a particular policy, we said, "Illegality per se is no longer the inevitable consequence of every agreement by a majority of the stockholders without regard to its purpose or effect." 222 Minn. at 78, 23 N.W.2d at 380. We said the test of legality is whether evidence exists of an intent to defraud other shareholders or to secure a private benefit at their expense or the corporation's. 222 Minn. at 79, 23 N.W.2d at 381. We concluded in *Hart* no such evidence existed and that, indeed, the defendants' complained of conduct benefited all shareholders indiscriminately as well as the corporation.

■ Here, of course, the restrictions are in favor of the minority stock interest, rather than, as in *Hart*, the majority interest. Nevertheless, the same considerations apply. The trial court found no evidence the restrictions complained of by appellants would defraud shareholders or the corporation, but rather that any benefits respondents receive would be shared in by all

shareholders without discrimination. Neither did the trial court feel the public was harmed; to the contrary, a dying business had been revitalized and new jobs created.

Appellants maintain this litigation has nothing to do with a creditor's right to protect his position; rather, the issue is whether two creditors turned minority shareholders may retain veto power over management decisions forever. They argue this chills the entrepreneurial incentive of the small businessperson; that the success of Lucht Engineering is due to Orren Lucht, yet he has lost control of "his" corporation. The venture capital firms, on the other hand, say the incentive to provide $125,000 without any security or personal guaranty to a company with a negative net worth and dismal financial prospects was the possibility of participating in an equity position in Lucht Engineering if prudent management ultimately caused it to be profitable. They point out that venture capitalists make high-risk investments, many of which fail, and it is contemplated these losses are to be recouped in the few ventures that do prosper.

Respondents also point out they have not used their veto power under the loan agreement arbitrarily in the past. Thus, for example, Lucht Engineering has entered the European market; developed and marketed new products; replaced significant employees, as well as increasing the over-all number to 85, including family members of Orren Lucht; moved to a larger and more costly business location; and extended perquisites to various employees in the form of travel and entertainment expenses and company-leased automobiles. In other words, in the important aspects of business management, it has not been shown the loan restrictions have been applied in such a fashion as to prejudice the best interests of the corporation and its shareholders.

We hold that the loan restrictions survive the change in status of Westland and Community Investment from creditors to minority stockholders. Beyond this, we believe the issue narrows down to whether the loan restriction on company purchases is enforce-

able to prohibit purchase by Lucht Engineering of an airplane costing over $25,000. We hold the restriction is enforceable.

■ While the loan restriction on company purchases is couched in absolute terms, as are the other restrictions, the minority shareholders have treated it as a veto power that may or may not be invoked. We believe enforceability of the restriction depends on whether consent to the purchase has been unreasonably withheld. We hold, in this instance, consent was not unreasonably withheld.

Under this test, it is relevant to inquire, as in *Hart v. Bell*, whether invoking the veto power works a fraud on other shareholders or confers a preference or private benefit on the minority shareholders at the expense of the corporation or the other shareholders, or otherwise contravenes public policy. Here the trial court correctly found no such adverse consequences resulted from enforcement of the loan restriction.

We need not decide today whether this loan restriction or any of the others, alone or in aggregate, would be enforceable in other situations and at other times. In *Capital Investments, Inc. v. Whitehall Packing Co.*, 91 Wis.2d 178, 280 N.W.2d 254 (1979), cited by appellants, the Wisconsin Supreme Court refused to enforce a loan agreement containing some 13 restrictions which applied so long as the lenders owned any stock at all. While the Wisconsin court commented in dicta that the loan agreement might be an unlawful delegation of board power, it did not reach that issue, as the case was decided on the basis of ambiguous language in the agreement itself construed against the lender. More to our purposes, the debtor there was naive and the case suggested overreaching. That is not the situation here.

■ 2. Appellants further argue the loan agreement unlawfully enhances the value of respondents' shares by conferring on them rights and privileges not conferred on the shares of others. We disagree.

Lucht Engineering has only one class of common stock. Appellants cite Minn.Stat.

§ 301.14, subds. 3, 4 (1980), as providing that shares of the same class and series "shall be in all respects equal to every other share." From this they argue that respondents' shares are given veto powers and board representation not given other shares, resulting in unlawful inequality. But this is not so. The veto power possessed by respondents is not inherent in the stock but exists by virtue of the loan agreement.

■ 3. Appellants next contend the loan agreement is unenforceable because it violates regulations promulgated by the Small Business Administration under the Small Business Investment Company Act. These regulations prohibit a licensee like Westland from assuming control over a small business they lend to by reason of management agreements, voting trusts, or otherwise. 13 C.F.R. § 107.901(a) (1981). The trial court ruled appellants lack standing to raise this issue. We agree.

Federal decisions on the issue hold the Small Business Investment Company Act confers no private right of action. The only remedy intended by Congress for violation of the regulations is administrative sanction against the licensee. *Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324, 1330–31 (S.D.N.Y.1974); *Talco Capital Corp. v. Canaveral International Corp.*, 225 F.Supp. 1007, 1013 (S.D.Fla.1964), *aff'd*, 344 F.2d 962 (5th Cir. 1965). It appears Congress did not intend that contracts be declared void or unenforceable for violating SBA regulations. *Talco*, 225 F.Supp. at 1013. We, in turn, will not apply that sanction here when Congress has chosen not to.

■ 4. Appellants argue the loan agreement does not give respondents any right to enforce the restrictions once their status changes from creditor to stockholder. This issue involves an interpretation of the contract language. The trial court held the loan agreement did give respondents the right to enforce the restrictions. We agree.

The question arises because paragraph 12 of the loan agreement, entitled "Remedies on Default, etc.," says, "If an Event or

Default shall have occurred and shall be continuing, the holder of any Debenture at the time outstanding may proceed to protect and enforce the rights of such holder * * *." Appellants point out the paragraph says nothing about a debenture holder turned minority shareholder having such a right to enforce the restrictions. The concluding sentence of the paragraph, however, says, "No right, power or remedy conferred hereby shall be exclusive of any right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise." This last sentence shows the right to enforce the restriction is not limited to the debenture holders, but may extend to a debenture holder who is now a shareholder.

■ 5. Finally, appellants contend the trial court erred by ordering a money judgment against Orren Lucht personally. They say Lucht was only sued in his capacity as company president and respondents never demanded this form of relief. The court's order, they conclude, is an abuse of power and a violation of Lucht's right to due process.

When respondents filed their lawsuit requesting an injunction, they did not know Lucht had already purchased the plane. They discovered this at the hearing. As a result, the trial was held on whether Lucht acted wrongfully in purchasing the plane with corporate funds and whether Lucht Engineering should be ordered to sell the plane. Thus the court's holding that the purchase violated the loan agreement necessarily implied that Lucht acted wrongfully.

Minn.Stat. § 316.03 (1980) says, "In any case affecting a corporation the district court may * * * [c]ompel any such officer [thereof] to pay to such corporation * * * all funds * * * lost, wasted, or damaged in violation of official duty * * *." Since Lucht caused the corporation to breach the loan agreement and thereby lose money, he is liable to the corporation for the loss. The trial court gave Lucht notice that the propriety of his actions was being judged and

section 316.03 permits the court to fashion the remedy it did.

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.