**TALCO CAPITAL CORPORATION,**
**Plaintiff,**

v.

**CANAVERAL INTERNATIONAL CORP.**
**and Bimini Run, Ltd., Defendants.**

**Civ. No. 63–125.**

United States District Court
S. D. Florida,
Miami Division.

Jan. 23, 1964.

Richard P. Kenney, Miami, Fla., for plaintiff.

Robert H. Givens, Jr., Miami, Fla., for defendants.

FULTON, District Judge.

This action is based on a contractual agreement which the plaintiff contends is a guaranty obligation whereby the defendants guaranteed a loan, which loan was made by the plaintiff to third parties, who are not here involved.

The defendants deny that the agreement created a guaranty. They contend that the agreement in question merely permitted defendants to pay off the loan, at their discretion, if the loan was in default, in order to prevent plaintiff from foreclosing on a trust deed in which both plaintiff and defendants had security interests.

The parties orally stipulated at trial that there were only two issues to be determined by the Court:

(1) Whether the defendants guaranteed payment of the loan; and

(2) If there was such a guaranty, whether it is nevertheless unenforceable on grounds of illegality.

The case was submitted to the Court on the pleadings, the pre-trial stipulation, certain oral stipulations at trial, and the documentary exhibits which

were admitted at trial. No witnesses testified at the trial.

The parties stipulated that parol evidence should not be resorted to with regard to the construction of the documents; and no parol evidence was received. Pursuant to this last stipulation, the Court has taken pains, in reaching its decision, to exclude from consideration the various depositions previously filed in the case.

Before attempting to examine in detail the contractual provisions which plaintiff claims constitute a guaranty, it will be helpful to briefly outline the complicated maritime subchartering arrangements, pertaining to the vessel "Calypso Liner", which arrangements formed the factual background for the loan made by plaintiff.

At the outset, the "Calypso Liner" was in possession of the defendant Bimini Run, Limited (a wholly owned subsidiary of defendant Canaveral International Corporation) under a bareboat charter from Atlantic Corporation, the owner of the vessel. Defendants desired to subcharter the vessel to two individuals, Rehaven S. Adiel and Harold Derber, who were to form a Bahamian corporation for purposes of operating the vessel under said subcharter. This rather simple object of subchartering the vessel was, for various reasons, implemented by an unusually complex series of transactions.

The defendants on one side, and Adiel and Derber on the other, entered into an "Agreement for Charter of Vessel", dated May 27, 1962, which was a preliminary agreement, which set out the terms to be incorporated later in the actual subcharter document. While the arrangement was in fact a subcharter, it should be noted that the parties used the word "charter" in the various documents involved. To avoid confusion, the court will in this opinion also refer to the arrangement as a "charter".

In preparing to take over the "Calypso Liner" as charterers, Adiel and Derber formed two corporations, instead of the one Bahamian corporation originally intended. The corporations which they formed were: Bimini Run of Bahamas, Limited, a Bahamian corporation; and Bahamas Travel Corporation, a Florida corporation. (The defendant corporation "Bimini Run, Limited" should not be confused with the Adiel-Derber corporation "Bimini Run *of Bahamas*, Limited".) By a supplemental agreement, dated May 31, 1962, the defendants and Adiel and Derber agreed that the word "charterer" used in the May 27 agreement would include the Florida corporation as well as the Bahamian corporation.

In order to secure the performance of their obligations under the charter, Adiel and Derber arranged to have Universal Timber Corporation, a Delaware corporation, which was wholly owned by them, execute a trust deed on certain Tennessee timberland, which gave the defendants the right to foreclose on the land upon any default by Adiel and Derber, or their corporations, in the performance of the charter covenants.

Under the May 27 agreement, Adiel and Derber were also required to pay to the defendant Bimini Run, Limited, at the time of execution of the charter, the sum of $125,000, for advance charter hire and equipment leases. It was in regard to this required cash payment that the plaintiff Talco Capital Corporation first came into this picture. Talco is a Small Business Investment Company licensed under the Small Business Investment Act of 1958. (15 U.S.C. §§ 681–688)

Talco did make the loan, in the amount of $150,000. The loan was made to Bahamas Travel Corporation, the Florida corporation, which was organized and controlled by Adiel and Derber, in return for a promissory note from that corporation, which note was endorsed by Adiel and Derber.

Talco received separate unconditional guarantees of repayment from Adiel and Derber, individually, and from Bimini Run of Bahamas, Limited, the Bahamian corporation. Talco also received a participating interest in the trust deed on the Tennessee land, which interest was

expressly stated to be superior to the interest of the defendants.

Bahamas Travel Corporation used approximately $120,000 of the proceeds of said loan to purchase from Bimini Run of Bahamas a block of passenger tickets on the "Calypso Liner", which tickets Bahamas Travel intended to sell to prospective customers in Florida. Bimini Run of Bahamas used the money received from the sale of said block of tickets to pay $120,000 of the $125,000 which it was required to pay to the defendant, Bimini Run, Limited, upon the execution of the charter.

A balance of $146,000 remains unpaid on the promissory note, which Bahamas Travel Corporation executed to Talco. This sum has been past due since November 1, 1962. It is this sum, with interest, that Talco seeks to recover from the defendants in this cause.

Talco contends that the defendants guaranteed repayment of the loan by virtue of certain provisions in the May 27 and May 31 agreements, which provisions will now be more closely examined.

The first provision to be considered is paragraph 9 of the May 27 agreement. This paragraph refers to Talco and to the loan transaction; and said paragraph 9 is one of the primary grounds for plaintiff's claim against the defendants herein. While paragraph 9 is rather long, it must be set out herein in its entirety if it is to be understood:

"9. CHARTERERS represent that they are in the process of obtaining a loan from TALCO CAPITAL CORP. in a principal sum of approximately $150,000.00 (although the documents of indebtedness may reflect a higher sum, being based upon a total of principal and interest). Said sum shall be repayable in the following manner: $1,000.00 per month for the first twelve months; thereafter there shall be sixteen (16) equal quarterly payments which shall be sufficient to fully pay off the debt with the 16th payment.

"As additional security to TALCO for repayment of its aforestated loan, it shall be granted an interest in and to the $450,000.00 Trust Deed owned by CANAVERAL or BIMINI to the extent of the sum of $150,000.00. Said interest shall be participating with CANAVERAL or BIMINI, but prior to their interests. Concerning said participating but prior interest, it is agreed that in the event of

"a) default on the part of CHARTERERS or UNIVERSAL, in payment of sums due to TALCO as above set forth, or

"b) default by CHARTERERS or UNIVERSAL in any obligations to CANAVERAL or BIMINI as set forth in section 8(b) (ii) of this agreement, and if CANAVERAL or BIMINI declares the trust deed obligation to have matured and to have become due and payable, or otherwise retake possession of the ship,

then TALCO shall have the right to call upon CANAVERAL or BIMINI to make the payments due from CHARTERERS or UNIVERSAL provided, however, that in the event of the happening of (a) above, TALCO shall notify CANAVERAL or BIMINI by registered or certified mail, at their address hereinafter set forth, of such default, upon receipt of which CANAVERAL or BIMINI shall have ten (10) days within which to proceed in the manner hereafter outlined.

"In the event of the happening set forth in subparagraph (b) above, CANAVERAL or BIMINI agrees that upon its declaration of default, TALCO shall have the same right to call upon CANAVERAL or BIMINI for performance as it has for the occurrence set forth in subparagraph (a), and CANAVERAL or BIMINI shall within ten (10) days after declaration of a default under subparagraph (b), have the right to proceed as hereinafter outlined.

"Upon receipt by CANAVERAL or BIMINI of the ten (10) days' notice from TALCO, it shall have the right to either make the payment that is delinquent and continue making payments due to TALCO in accordance with the repayment provisions above set out until the entire obligation is paid in full, or it may forthwith pay in full the entire obligation, it being understood and agreed that at no time shall the entire balance remaining due be in excess of $150,000.00, or in the alternative, may continue making payments and subsequently pay in full the entire balance.

"Upon payment in full of the then remaining balance of the TALCO loan by CANAVERAL or BIMINI, then CANAVERAL or BIMINI shall forthwith receive from TALCO by appropriate document, all of TALCO'S right, title and interest in and to the Deed of Trust, and any and all other collateral held by TALCO.

"In the event of CANAVERAL'S or BIMINI'S foreclosure of the Deed of Trust without first paying in full the entire obligation to TALCO, it is agreed that of the proceeds of foreclosure sale, CANAVERAL or BIMINI shall hold, as trustee, all moneys then remaining due to TALCO, said moneys in no event to exceed $150,000.00.

"It is further provided concerning paragraph (b) above, that upon such default as is referred to therein, CANAVERAL shall give TALCO written notice as hereafter outlined, upon receipt of which TALCO shall have the right to come forward and voluntarily cure said default within ten (10) days of receipt of such notice, and thereby retain CHARTERERS or UNIVERSAL in good standing."

Talco was not a party signatory to the May 27 agreement, although it was referred to therein. On May 31, 1962, Talco joined with the defendants and Adiel and Derber in executing the supplemental agreement which has been previously referred to in this opinion. The May 31 agreement recited the existence of the May 27 agreement and stated that Talco was in the process of making the described loan to Bahamas Travel Corporation. It then provided, among other things, as follows:

"1. The provision of paragraph 9 of the aforesaid 'Agreement for Charter of Vessel' bearing date the 27th day of May, 1962, shall be in full force and effect and accrue to the benefit of Talco.

\* \* \* \* \* \*

"4. Wherever said 'Agreement for Charter of Vessel' refers to the Charterers, said term shall equally apply to Bahamas Travel Corp."

\* \* \* \* \* \*

The May 31 agreement also restated in more detail the particular provision of paragraph 9, which set forth the three alternative methods by which defendants could pay off said loan, as follows:

"For purposes of clarification of the 3rd paragraph on Page 17 of the Agreement for Charter of Vessel dated May 27, 1962, it is understood and agreed that the following is the meaning:

"Upon receipt by Canaveral and/or Bimini of the ten days' notice from Talco, it shall have the right to do any one of the following:

"A. To make the delinquent payment and to continue to make the subsequent payments due Talco, as if and when due, until the entire indebtedness of the Charterers to Talco is fully paid.

"B. Forthwith pay to Talco the sum of $150,000.00, or such sum as is actually due Talco under its agreement and/or note with the Charterers, without interest and unearned bonus, whichever is lesser.

"C. To make the payment or payments set forth in A above and subsequently pay to Talco the

lesser of the following: (I) the sum of $150,000.00, regardless of any payments previously made by Charterers and/or Bimini to Talco; or (II) the balance actually due Talco under its aforesaid note and/or agreement, without interest and unearned bonus.

"Talco and the Charterers acknowledge the fact that the loan to the Charterers is in the sum of $150,000.00 and the note in the face amount of $200,000.00, without interest, except after default when interest accrues at the rate of 15% per annum."

The first issue raised by the documents which are involved in this case is whether any guaranty promise was in fact made by defendants. If it were only a matter of construing the language:

"* * * Talco shall have the right to call upon Canaveral or Bimini to make the payments due from charterers * * *"

in paragraph 9, the Court would have little difficulty in construing this as a guaranty obligation, since "call" can be taken to have the same meaning as "demand". In re Wolters' Estate, 359 Pa. 520, 59 A.2d 147 (1948). Moreover, it is the general rule that neither the word "guaranty" nor any other special expression is necessary to constitute a guaranty obligation. 38 C.J.S. Guaranty § 18, p. 1155; Goldring v. Thompson, 58 Fla. 248, 51 So. 46, 25 L.R.A.,N.S., 418 (1909). However, defendants insist that the "right to call" language must be considered in light of all of said paragraph 9, and that as thus construed, paragraph 9 really was inserted more for defendants' benefit than for Talco's benefit.

Defendants' construction of paragraph 9 is based on the fact that the sentence containing the "right to call" language begins with the statement "Concerning said participating, but prior interest * * *" and which then goes on to relate that, in the event of various defaults, Talco has the right to call for payment. Defendants also stress that provision, near the end of paragraph 9, which states that if defendants should foreclose the trust deed without first paying Talco in full, defendants would be obligated to hold all foreclosure proceeds, up to $150,000, in trust for Talco.

From these two provisions in paragraph 9, defendants conclude that the true construction of said paragraph is that, in the event of a "call" by Talco, the defendants would have the right to elect whether: (1) To pay off the unpaid loan to Talco, in any of the three ways listed, and thus acquire Talco's prior interest in the trust deed; *or* (2) To pay nothing to Talco, but rather foreclose the trust deed themselves and merely hold in trust for Talco, out of any proceeds of the foreclosure, an amount not exceeding $150,000.

The difficulty with defendants' position is that this "either—or" construction that they place on paragraph 9 nowhere appears explicitly in its language. On the contrary, the three alternative methods of payment are listed with no indication that there is any other alternative. As for the provision at the end of paragraph 9 relating to foreclosure of the trust deed by the defendants prior to "paying in full the entire obligation to Talco", such provision is entirely consistent with an obligation in defendants to pay off the loan upon a "call" by Talco. This is so because defendants had the option of satisfying the call by making installment payments. Thus, even after responding to their duty under the call, they could be in a position to foreclose before Talco had been paid "in full".

Finally, the May 31 agreement, which included a paragraph specifically for purposes of "clarification" of the provision on methods of payment in said paragraph 9 of the May 27 agreement, again did not indicate any method of payment contrary to, or different from the methods of payment which are set out in paragraph 9.

It must be conceded that the language "Concerning said participating but prior interest * * *" appearing in paragraph 9 of the May 27 agreement, stand-

ing alone, could justify defendants' position. But, the "default" and "right to call" language, and the rest of said paragraph, do not support this conclusion. Moreover, several days later, in the May 31 agreement, which was the first instrument in which Talco had any part, the parties expressly agreed that paragraph 9 should "accrue to the benefit of Talco". If paragraph 9 were to be construed as defendants ask, there would be precious little benefit to "accrue" to Talco. In these circumstances, the Court is compelled to conclude that the "participating interest" language, construed in light of *both* the May 27 and May 31 agreements, was merely a recognition that Talco would be a beneficiary under the trust deed, and did not qualify Talco's "right to call" upon defendants if the loan was not repaid.

This conclusion is reinforced by numerous references to the "obligations" and "liability" of the defendants, upon a call by Talco, which references may be found in the trust deed and other documents relating to this transaction. For example, the trust deed, which is referred to in paragraph 9 and in the May 31 agreement, provides:

> "In the event of default as aforesaid, either Canaveral, Bimini or Talco may require the Trustee to sell the property hereunder, but regardless who requires the sale  *  *  * Talco is to first receive any proceeds hereunder to the extent of their interest, or $150,000.00, whichever the lesser of the two.
>
> "The sale under this Trust Deed shall not of itself act to release Canaveral or Bimini from their obligations under the 'call' by Talco according to the provisions of the Charter Hire Agreement, except if Talco is paid in full."  (pp. 13–14)

and further, by language found in the trust deed (and also found, in substance, in the May 27 agreement) as follows:

> "Canaveral and/or Bimini agree to release and satisfy the herein Trust Deed provided:

> "(a) that Talco is paid in full and/or an appropriate instrument releasing Canaveral and/or Bimini from further liability on its call, as hereinafter set forth, is delivered; and if simultaneously therewith,
>
> "(b) payment to Canaveral or Bimini of the sum of $150,000.00 in cash or delivery of $150,000.00 worth of negotiable securities satisfactory to Canaveral or Bimini is made, or,
>
> "(c) upon full, faithful and complete payment to Bimini Run, Ltd., of all sums due and payable to them up to and including March 31, 1972, as charter hire under the Bareboat Subcharter together with the release from Talco, as provided in paragraph (a) above."  (p. 13)

The May 27 agreement itself, in portions other than paragraph 9, refers to obligations of the defendants to Talco. In providing for a right for the Adiel and Derber interests, as charterers, to cancel the charter in certain circumstances, the May 27 agreement states that such right may be exercised:

> "  *  *  *  provided, however  *  * that release of Canaveral from any and all obligations to Talco of any nature be obtained  *  *  *"  (p. 23)

In addition, paragraph 20 of the May 27 agreement provides:

> "Each party hereby guarantees to the other that each party can, and is legally constituted to perform all covenants and conditions imposed upon it hereunder, and that each corporate party hereto is in good standing, and is lawfully able to do all things agreed upon, including but not limited to standing as a surety or guarantor for another person, firm or corporation. In furtherance hereof, each corporate party agrees to provide at or prior to closing hereof, duly certified corporate resolutions approving this transaction and

the respective corporations' obligations thereunder."

Thereafter, Bimini Run, Limited, adopted a corporate resolution which approved the chartering of the vessel; and Canaveral International Corporation adopted a resolution relating to the May 27 agreement as follows:

"Resolved: That the agreement of May 27, 1962, for charter of the motor vessel Calypso Liner, insofar as the same is related to Canaveral International Corp., be and is hereby ratified and affirmed in all respects, together with all documents executed in consummation thereof on May 31, 1962, including but not limited to the call agreement between Canaveral International Corp. and Talco Capital Corp."

For the reasons stated, the Court concludes that the defendants did guarantee the repayment of the loan by the agreements of May 27 and May 31, 1962.

■ This brings us to the second defense which has been asserted by the defendants—the contention that even if a guaranty promise was made, it is unenforceable due to the alleged "illegality" of the loan which it secured. This defense is based on the charge by defendants that the loan from Talco to Bahamas Travel Corporation violated a federal regulation which prohibits licensees, such as Talco, from making certain loans under the Small Business Investment Act. The pertinent regulation is 13 C.F.R., Sec. 107.715, which reads in part as follows:

"107.715 *Prohibited uses.*

"No funds may be provided by a licensee for:

\* \* \* \* \* \*

"(d) Use outside the States: *Provided, however,* That a Licensee may provide funds to a small business concern which is subject to State or Federal jurisdiction, (1) for use in the domestic production of products for distribution abroad, or to acquire abroad materials for such operation or (2) for use in its branch operations abroad or for transfer to its controlled foreign subsidiary in exchange for further equity interest in or the monetary obligation of such foreign subsidiary; so long as the major portion of the assets and activities of such concern, after funds are so employed, remains within the territorial jurisdiction of the States."

Defendants argue that when Bahamas Travel Corporation, the Florida corporation, received the loan from Talco, it was a mere "conduit", through which the loan was actually made to Bimini Run of Bahamas, a foreign corporation, and that this procedure violated Section 107.-715.

Whether the loan did violate the regulation, or, if it did, whether such a violation would affect the validity of the guaranty, are questions which the Court finds unnecessary to decide. The Court is of the opinion that even if it is assumed that the loan did violate the regulation, such "illegality" is insufficient to render either the loan or the guaranty contract unenforceable.

The regulation in question is essentially a delineation of the authorized powers of small business investment companies, licensed under the federal law. Neither the regulation, nor the statute, state that loans made in excess of such authority are void or unenforceable. Indeed, the statute itself does not discuss authorized and unauthorized loans. No criminal penalty is provided for violation of the regulation. The only result of a licensee violating the regulation is that the government *"may"* use the violation as a ground for revoking its license. See 13 C.F.R., Secs. 107.901; 107.902.

■ It has been generally held that a contract in violation of a statute, which statute does not expressly declare such contract to be void, will be enforced unless there is some other indication within the statute of legislative intent to invalidate such contract. Border National Bank v. American National Bank, 282 F. 73 (5th Cir. 1922), cert. denied, 260

U.S. 701, 732, 43 S.Ct. 96, 67 L.Ed. 471; Nielsen v. Davidson, 66 Cal.App. 442, 226 P. 825 (1924); 17 C.J.S. Contracts §§ 201, 202. In the present case, no such legislative intent to invalidate is apparent. The regulation involved is primarily concerned with the powers of licensees, rather than the voiding of contractual obligations otherwise legal.

■ Since Florida was the situs of the contracts on both the loan. and the guaranty involved in this case, the applicable law in determining contractual validity in this diversity case normally would be the law of Florida. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Hagen v. Viney, 124 Fla. 747, 169 So. 391 (1936).

The fact that a federal statute and regulation is involved might authorize reliance on the non-Florida cases already cited, but a decision on this point is unnecessary because Florida law is not inconsistent with such cases. While Florida has not passed on a case exactly like the present one, there is no reason to believe it would depart from the general rule. 7 Fla.Jur. Contracts, Sec. 60. There have been some contrary indications in certain Florida cases, but these appear clearly distinguishable from the present case. In Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 So. 761 (1907), relied upon by defendants, the Florida court did state a broad rule of invalidity but that case involved a statute which specifically stated "no contract (contrary to the statute) shall be legal or binding". In Town of Boca Raton v. Raulerson, 108 Fla. 376, 146 So. 576 (1933), the Florida court held a contract void even though the statute did not expressly so state. However, the court emphasized that it was dealing with a criminal penal statute and said:

> "Where a statute pronounces a penalty for an act, a contract founded on such act is void, although the statute does not pronounce it void nor expressly prohibit it." (146 So. 577)

In the present case, no such criminal penalty is involved.

Also persuasive in the present case is the similarity this case bears to those decisions, both in Florida and other jurisdictions, refusing to hold a partly performed contract unenforceable simply because a corporate party acted *ultra vires* with respect to the contract. Brown v. Marion Mortgage Co., 107 Fla. 727, 145 So. 413 (Fla.1932); 7 Fla.Jur. Corporations, Sec. 243; 13 Am.Jur. Corporations, Sec. 768. Admittedly, such cases involve corporate acts violating the corporate charter rather than a statute. However, the administrative regulation involved in the present case, when realistically viewed, is in effect the "charter" setting forth the authorized powers of small business investment companies licensed pursuant to the federal law. Violation of such a narrowly applied regulation should have no greater effect than violation of a private corporate charter.

The preceding discussion of the "illegality" defense has assumed that the loan made by Talco in this case did violate Section 107.715 of the regulations. Plaintiff strenuously argues that a loan to a domestic corporation, which uses the loan proceeds to buy passenger tickets from a foreign corporation for purposes of resale, does not violate the regulation. Plaintiff introduced into evidence a document from the Small Business Administration purporting to show approval of the loan in question and plaintiff asserts that this approval forecloses any question of illegality. Although this argument may have merit, the Court prefers not to rest its decision on this basis. Regardless of the legal effect which such an approval might have, a question not necessary to decide in this case, it does not appear from the document presented that the administrative agency had all the facts before it concerning the transactions between Bahamas Travel and Bimini Run of Bahamas, and therefore, its approval of the loan carries little weight, one way or the other, on the question of

whether Section 107.715 of the regulations was violated.

For the reasons previously stated, the Court concludes that the guaranty contract in this case is not unenforceable, even if it be assumed that the loan transaction did violate the federal regulation.