UNITED STATES of America,
Plaintiff–Appellant,

v.

FIDELITY CAPITAL CORPORATION,
A Georgia Corporation, Defendant,

Commonwealth Mortgage Corporation
of America, Intervenor–Appellee.

No. 87–8945.

United States Court of Appeals,
Eleventh Circuit.

Nov. 24, 1989.

G. Michael Banick, Ronald T. Gold, Atlanta, Ga., for plaintiff-appellant.

Joseph R. Manning, Thomas T. Tate, Morris, Manning & Martin, Atlanta, Ga., for intervenor-appellee.

Before TJOFLAT, Chief Judge, FAY,

Circuit Judge, and SHARP *, District Judge.

PER CURIAM:

### I.

On September 19, 1986, the United States District Court for the Northern District of Georgia appointed the Small Business Administration (SBA) receiver of Fidelity Capital Corporation, a firm that had been designated a small business investment company under the Small Business Investment Act of 1958, Pub.L. No. 85–699, tit. III, 72 Stat. 689, 691 (as amended).[1] The order of appointment gave the SBA broad powers, including the authority to foreclose any mortgages Fidelity owned. Exercising this authority, the SBA began nonjudicial proceedings, pursuant to Ga. Code Ann. § 44–14–162 (1982), to foreclose a mortgage Fidelity held on a parcel of real estate in Atlanta, Georgia—the Peachtree/Cantrell property—by exercising a power of sale contained in the mortgage.[2]

When the SBA advertised the foreclosure sale (the first step in the nonjudicial proceedings), Commonwealth Mortgage Company, claiming that it owned the property, moved the district court for leave to intervene in the receivership action and to declare Fidelity's mortgage, which had not been satisfied of record, null and void.[3] According to Commonwealth, Fidelity had released its mortgage lien in December 1982, but through oversight the release had not been recorded.

The district court granted Commonwealth leave to intervene and, thereafter, the declaratory relief it sought. The SBA now appeals, contending that the district court's decision is contrary to Georgia law.[4] Because the district court's findings of fact are inadequate to permit meaningful review of the dispositive issue in this case, we vacate its judgment and remand the case for further findings of fact and conclusions of law.

### II.

The record does not indicate when Fidelity became a small business investment company; all that we know is that it became such prior to the events that gave rise to the present controversy. The relevant events began in 1979, when American Financial Resources, a company owned by Alfred Skiba, purchased Fidelity (which had already been designated a small business investment company and was substantially indebted to the SBA). After the purchase, Skiba caused Fidelity to organize Townehouse Concepts as a wholly owned corporate subsidiary of Fidelity. Skiba served as the sole director and president of American, Fidelity, and Townehouse, and

---

* Honorable G. Kendall Sharp, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. The district court had jurisdiction to appoint the SBA receiver of Fidelity pursuant to 15 U.S.C. § 687(c) (1982). Subsections (b) and (c) of that statute gave the court the authority to take jurisdiction of Fidelity's assets and to appoint a SBA receiver "to hold or administer [such assets] under the direction of the court."

2. Section 44–14–162 states that:
   No sale of real estate under powers contained in mortgages, deeds, or other lien contracts shall be valid unless the sale shall be advertised and conducted at the time and place and in the usual manner of the sheriff's sales in the county in which such real estate or a part thereof is located and unless notice of the sale shall have been given as required by Code Section 44–14–162.2.
   Ga.Code Ann. § 44–14–162 (1982). Although section 44–14–162 does not explicitly create a right to nonjudicial foreclosure of a mortgage that contains a power of sale such as the one SBA invoked in this case, the statute implicitly authorizes such a contractually created right by providing minimal standards for nonjudicial foreclosure. *See Global Indus. v. Harris,* 376 F.Supp. 1379, 1383 (N.D.Ga.1974).

3. As noted, *see supra* note 1, the district court had acquired jurisdiction of Fidelity's assets and had given the SBA the authority to administer them under the court's supervision. Commonwealth moved to intervene in the receivership proceeding for the purpose of challenging the existence of one of the assets before the court, i.e., Fidelity's mortgage on the Peachtree/Cantrell property. The court obviously had the power, under principles governing ancillary jurisdiction, to litigate Commonwealth's challenge.

4. Because all of the relevant events in this case occurred in Georgia, the substantive law of that state provides the rule of decision in this case.

because he was the sole shareholder of American, he effectively owned all three companies.

In September 1980, Fidelity purchased from Southeastern Land Fund a tract of land, the Peachtree/Cantrell property, for $400,000. Fidelity paid for the tract by giving Southeastern $100,000 in cash and a $300,000 promissory note, secured by a first mortgage on the property. Fidelity then conveyed the Peachtree/Cantrell property to Townehouse. The record does not reveal the total consideration Townehouse gave Fidelity for the property; all we know is that Townehouse assumed Fidelity's $300,000 obligation to Southeastern, and that, as of April 12, 1982, Townehouse owed Fidelity the sum of $1.7 million.

On April 12, 1982, Skiba caused Townehouse to give Fidelity a $500,000 promissory note [5] and a second mortgage on the Peachtree/Cantrell property as security. Skiba then caused Townehouse to convey the property, subject to this mortgage and to the first mortgage held by Southeastern, to American. American paid Townehouse for the property by agreeing to pay Townehouse's $500,000 note to Fidelity. Finally, Skiba caused American to convey the property to Peachtree/Cantrell, Inc. (P/C, Inc.), a wholly owned subsidiary of American. P/C, Inc. paid American for the property by assuming American's obligation to Townehouse to pay Townehouse's $500,000 note to Fidelity.[6]

To recapitulate, following the above transactions, P/C, Inc. owned the Peachtree/Cantrell property, subject to Southeastern's $300,000 first mortgage and Fidelity's $500,000 second mortgage (which American and P/C, Inc. had agreed to pay).

In December 1982, P/C, Inc. obtained a commitment from Commonwealth to finance the construction of some residential condominiums on the Peachtree/Cantrell property: Commonwealth would give P/C, Inc. a $3.6 million loan secured by a first mortgage on the property. This meant that the first and second mortgages held respectively by Southeastern and Fidelity would have to be satisfied before the loan could be closed.

The closing took place on December 20, 1982: P/C, Inc. received $3.6 million and Commonwealth received a mortgage on the Peachtree/Cantrell property. The mortgage did not, however, create a first lien on the property. P/C, Inc. had not obtained a satisfaction of Fidelity's mortgage; consequently, Commonwealth's mortgage created a second lien on the property, inferior to the lien created by Fidelity's $500,000 mortgage.[7]

Robert L. Dodd, Jr., a Georgia lawyer, represented P/C, Inc.[8] and Commonwealth [9] at the December 20 closing. As Commonwealth's attorney, Dodd had the responsibility of (1) obtaining a title insurance policy for Commonwealth that would insure its mortgage interest in the Peachtree/Cantrell property, (2) ensuring that the items listed in the title insurance binder as conditions precedent to the issuance of the policy were met prior to the disbursement of the loan proceeds, and (3) disbursing the proceeds of the loan.

The first step Dodd took in carrying out his duties for Commonwealth was to hire Paul McClarty, a lawyer who specialized in real estate transactions, to examine the title of the Peachtree/Cantrell property and to obtain a commitment from a title insurance company to issue a policy insuring Commonwealth's mortgage. McClarty examined the title and in the process found the mortgages that Southeastern and Fidelity held on the property. McClarty there-

---

5. Although the record does not reveal the terms of the note, it appears that the note was payable in full on January 31, 1985.

6. After these transactions were concluded on April 12, 1982, Skiba caused Townehouse to be dissolved.

7. Commonwealth moved to intervene in this case in an effort to correct this problem.

8. At the time, Dodd was Skiba's lawyer, and he represented all of Skiba's companies in transactions such as this one.

9. Commonwealth used Dodd to represent it at the closing because its regular attorney, who resided in Texas, did not have an "escrow account" in Georgia.

after requested a title insurance binder from Chicago Title Insurance Company, which issued a binder disclosing those mortgages and stated that they would have to be satisfied before the requested insurance policy could take effect. McClarty delivered the binder to Dodd on December 1, 1982. Dodd, in turn, forwarded the binder to Commonwealth. Then, a few days prior to the closing, Commonwealth sent Dodd an instruction letter that, among other things, required him to obtain satisfactions of the two mortgages before disbursing the loan proceeds.

As indicated, the closing took place on December 20, 1982. Dodd appeared at the closing, representing both Commonwealth and P/C, Inc., and presided.[10] As counsel for these respective parties, Dodd had P/C, Inc. execute a $3.6 million note and mortgage in favor of Commonwealth, received a satisfaction of Southeastern's $300,000 mortgage, and disbursed the net proceeds of the $3.6 million loan to P/C, Inc. Dodd disbursed these proceeds, however, without first obtaining a satisfaction of the $500,-000 mortgage Fidelity held on the property.

Dodd's failure to obtain a satisfaction of Fidelity's mortgage did not become an issue until August 1987, when the SBA advertised that it would foreclose Fidelity's mortgage pursuant to Ga.Code Ann. § 44–14–162 (1982). Every time P/C, Inc. sold one of the condominiums that had been built on the Peachtree/Cantrell property, however, Fidelity executed a quitclaim deed granting the buyer a title unencumbered by Fidelity's mortgage interest. Thus, prior to August 1987, someone was aware that Fidelity's mortgage had not been satisfied of record and thus might not have been paid.

Meanwhile, Fidelity was running into financial difficulties, eventually defaulting on its note to the SBA, on which the sum of $9.6 million was due and owing. In an effort to salvage the situation, the SBA restructured the note, affording Fidelity a more lenient payment schedule. Fidelity's troubles continued, however, and, on Sep-

tember 19, 1986, the SBA brought this action in the district court to place Fidelity in receivership and collect on its note. By that time, Fidelity was insolvent and owed the SBA a total of $13.8 million, representing the unpaid principal indebtedness and accrued interest.

In February 1987, while the SBA was prosecuting this case, P/C, Inc. defaulted on its Commonwealth loan, and Commonwealth, exercising the power of sale contained in its mortgage on the Peachtree/Cantrell property, foreclosed the mortgage pursuant to section 44–14–162 and obtained a deed to the property. Commonwealth accomplished this without notice (other than that afforded by the statutory advertisements) to Fidelity, which, as we have noted, held of record a superior lien.

Then, in June 1987, the SBA, acting as Fidelity's receiver and apparently unaware of the Commonwealth foreclosure, began nonjudicial proceedings under section 44–14–162 to foreclose Fidelity's mortgage. When Commonwealth learned that SBA was taking this step, it moved the district court for leave to intervene as a party in this case.

The district court granted Commonwealth's motion and entered a temporary restraining order, precluding the SBA from proceeding with the foreclosure; it then convened a bench trial on the merits of Commonwealth's request that the court declare Fidelity's mortgage null and void. The court, after considering the events we have set forth, found that Dodd's failure to obtain a satisfaction of Fidelity's $500,000 mortgage before disbursing the net proceeds of the Commonwealth loan to P/C, Inc. was Skiba's fault. In the court's view, Fidelity and P/C, Inc. "were, for all intents and purposes, Mr. Skiba"; thus, to permit Skiba to retain Fidelity's $500,000 mortgage in addition to the net proceeds of the $3.6 million loan would give Skiba a windfall of $500,000. Such a result, the court concluded, would be inequitable; accordingly, the court barred the SBA, which it treat-

---

**10.** Skiba and others, including one or more representatives of Commonwealth, also attended the closing. Their participation is irrelevant to the issues presented in this appeal.

ed as standing in Skiba's shoes, from foreclosing Fidelity's mortgage.[11]

### III.

Fidelity never represented to Commonwealth that it would release its mortgage lien on the Peachtree/Cantrell property if Commonwealth would give P/C, Inc. a construction loan.[12] Skiba might have made such a representation to Commonwealth, but if he did, he was not speaking for Fidelity. Thus, in order to grant Commonwealth the relief it sought, the court had to find that, if Skiba made such a representation, at the time he made it, Fidelity was his alter ego—that his representation was, in effect, Fidelity's.

The court could not make such a finding on the mere fact that Skiba owned and controlled Fidelity, for, under Georgia law, the owner of a corporation and the corporation are treated as separate entities. This is so even though the owner "uses the corporation or controls it to promote [his] own ends." *Boafo v. Hospital Corp. of Am.*, 177 Ga.App. 75, 338 S.E.2d 477, 479 (1985); *see Stillman v. Tempo Carpets, Inc.*, 174 Ga.App. 66, 329 S.E.2d 197, 198 (1985); *Barnes v. Finnegan Enters.*, 150 Ga.App. 430, 258 S.E.2d 55, 55–56 (1979). Rather, to hold that Fidelity and Skiba constituted one legal entity, the court had to find that Skiba, as Fidelity's owner, abused Fidelity's corporate form—i.e., that Skiba used the company in disregard of the corporate form by, for example, commingling its assets with his or failing to maintain Fidelity's records separately. *See Amason v. Whitehead*, 186 Ga.App. 320, 367 S.E.2d 107, 108 (1988); *Earnest v. Merck*, 183

Ga.App. 271, 358 S.E.2d 661, 663 (1987); *see, e.g., Stewart Bros. v. Allen*, 189 Ga. App. 816, 377 S.E.2d 724, 725–26 (1989); *Abbott Foods, Inc. v. Elberton Poultry Co.*, 173 Ga.App. 672, 327 S.E.2d 751, 752 (1985).

The court found, as a threshold point, that Fidelity (and, for that matter, P/C, Inc.) "scrupulously maintained" the corporate form.[13] Then, without finding that Skiba somehow abused Fidelity's corporate form, the court reached a contradictory conclusion: that "Fidelity ... [was] for all intents and purposes[ ] Mr. Skiba." [14]

Without any findings of fact to support it, this conclusion cannot stand. To be sure, we could search the record to determine whether the evidence adduced by the parties would permit a finding that Skiba abused Fidelity's corporate form; if we did so, and concluded that such a finding could reasonably be made, we could end the matter here. We decline to take this step, however. The record is quite complicated, and the task of determining, in the first instance, whether Commonwealth has proved a case of abuse that mandates the disregard of Fidelity's independent legal status properly belongs to the district court.

We accordingly vacate the district court's judgment and remand the case to that court for the entry of findings of fact and conclusions of law on the issue of abuse of the corporate form. Meanwhile, we retain jurisdiction of this appeal. After the district court has finished its task, which is to be accomplished within sixty days of the receipt of our mandate, and certified its

11. The district court's dispositive order reads, in pertinent part, as follows:

Considering all the evidence and testimony presented, this court cannot allow [Fidelity] to foreclose on the [Fidelity] deed. It is true that the corporate forms of [P/C, Inc.] and [Fidelity] have been scrupulously maintained, and that [Fidelity] did not affirmatively promise to release its deed. However, the reality was that [Fidelity] and [P/C, Inc.] were, for all intents and purposes, Mr. Skiba. Mr. Skiba's intent was to release that deed. He testified that had he been presented a release, he would have signed it as president of [Fidelity]. This court could not in equity allow Mr. Skiba

or [Fidelity] to benefit from their failure to carry out what was agreed and intended.

12. As the district court found, Fidelity "did not affirmatively promise to release its [mortgage lien]." *See supra* note 11.

13. In its dispositive order, the court stated: "It is true that the corporate forms of [P/C, Inc.] and [Fidelity] have been scrupulously maintained." *See supra* note 11. We are convinced, after examining the record, that this statement of fact is unassailable.

14. *See supra* note 11.

findings and conclusions to this court, the parties will be given an opportunity to file supplemental briefs.

VACATED and REMANDED, with directions.