**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**FIDELITY CAPITAL CORPORATION,
a Georgia Corporation, Defendant,**

**Commonwealth Mortgage Corporation
of America, Intervenor-Appellee.**

No. 87-8945.

United States Court of Appeals,
Eleventh Circuit.

Jan. 10, 1991.

G. Michael Banick, Ronald T. Gold, Atlanta, Ga., for plaintiff-appellant.

Joseph R. Manning, Thomas T. Tate, Morris, Manning & Martin, Atlanta, Ga., for intervenor-appellee.

Before TJOFLAT, Chief Judge, FAY, Circuit Judge, and SHARP *, District Judge.

TJOFLAT, Chief Judge:

In our earlier decision in this matter, *United States v. Fidelity Capital Corp.*, 888 F.2d 1344 (11th Cir.1989) (*Fidelity I*), we remanded the case to the district court to determine whether Fidelity Capital Corporation (Fidelity), a company licensed as a Small Business Investment Company (SBIC) under the provisions of the Small Business Investment Act of 1958, Pub.L. No. 85–699, 72 Stat. 689 (codified as amended at 15 U.S.C. §§ 661–697c (1988)), was the alter ego of Alfred F. Skiba, its president and the sole shareholder of its parent company. We instructed the district court to make findings of fact and conclusions of law on the alter ego issue and to certify its holding to this court. The district court has done so, and we now proceed to a resolution of this dispute.[1]

We organize the opinion as follows. In part I, in subpart A, we outline the federal provisions governing SBICs, and, in subpart B, we state the relevant facts as found by the district court, most of which are undisputed.[2] In part II, we set forth the district court's application of Georgia law[3] to these facts and its conclusion that Fidelity was Skiba's alter ego. In part III, we find that the district court erred in its application of the law to the facts.

## I.

### A.

Congress passed the Small Business Investment Act of 1958 (the Act) in order to encourage the growth of small businesses by compensating for the difficulty they

---

\* Honorable G. Kendell Sharp, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. As we noted in *Fidelity I,* the district court had jurisdiction to litigate the alter ego issue. Pursuant to 15 U.S.C. § 678c(b)–(c), the present action began when the district court properly took jurisdiction over Fidelity's assets at the request of the United States and appointed the Small Business Administration (SBA) as receiver to hold and administer those assets under the continuing supervision of the court. When the SBA, exercising its broad authority as receiver, foreclosed on a mortgage Fidelity held, Commonwealth Mortgage Corporation of America (Commonwealth) intervened, claiming that it owned the mortgaged property by virtue of an earlier foreclosure under another mortgage.

The district court had ancillary jurisdiction to determine the merits of Commonwealth's state-law claim that its mortgage was prior to Fidelity's; the alter ego issue arose as part of this determination. *See Fidelity I,* 888 F.2d at 1345, nn. 1 & 3.

2. We include some undisputed facts that the district court did not specifically find; most of these facts are drawn from Skiba's testimony at trial and in deposition. The district court found that Skiba's testimony was "credible" and "largely uncontroverted."

3. Georgia law governs the substantive aspects of the case, because all the relevant events occurred in Georgia. *Fidelity I,* 888 F.2d at 1345 n. 4.

may have in obtaining financing from conventional lenders.[4] The Act accordingly authorizes the Small Business Administration (SBA)[5] to license SBICs, which are corporations or partnerships that provide capital to small businesses. 15 U.S.C. § 681.[6] The SBA lends money to its licensees by purchasing or guaranteeing their debentures; SBICs use these funds to assist small businesses in the manner permitted by the Act and the regulations that the SBA has promulgated thereunder. Id. §§ 683(a)–(b), 687(c); 13 C.F.R. § 107.201 (1990).[7] The Act allows SBICs to finance small businesses in two major ways, by long-term loans or through equity investment. 15 U.S.C. §§ 684(a), 685(a); 13 C.F.R. §§ 107.320, .402.[8]

The Act and the regulations limit SBICs' investment decisions by governing the amount, terms, and conditions of financing they may provide. For instance, most SBICs must have a diversified portfolio of investments in small businesses, and certain types of investments, such as real estate, are strictly curtailed. Id. § 107.101(c).[9] Similarly, the SBA limits the amount of financial assistance an SBIC may provide to any one small business to twenty percent of the SBIC's private capital. 15 U.S.C. § 686(a); 13 C.F.R. § 107.303.[10] All loans made by SBICs must be "of such sound value, or so secured, as reasonably to assure repayment." 15 U.S.C. § 685(e).[11] Any control an SBIC (or its officers, directors, and related companies) acquires over a small business in which it invests must be temporary, subject to a written agreement to relinquish control within seven years. 13 C.F.R. § 107.801.[12] Additionally, SBICs may not

**4.** The Act states, in pertinent part:
It is declared to be the policy of Congress ... to improve and stimulate the national economy ... and the small-business segment thereof ... by establishing a program to stimulate and supplement the flow of private equity capital and long-term loan funds which small-business concerns need ... and which are not available in adequate supply....
15 U.S.C. § 661.

**5.** The United States is the plaintiff (because it filed the initial complaint asking the district court to take jurisdiction of Fidelity's assets) and defendant-in-intervention in this action. See supra note 1. The SBA, however, is Fidelity's receiver and has been active in this suit. For the sake of clarity and convenience, we refer to the SBA throughout.

**6.** When the SBA is deciding whether to license an SBIC, it considers the need for small business financing in the area in which the SBIC will operate, the business reputation and character of the proposed owners and management, and the probability that the SBIC will be successful and financially sound. 15 U.S.C. § 681(c). SBICs formed to invest in small companies owned by socially or economically disadvantaged persons, id. § 681(d), are subject to more lenient standards and restrictions, see, e.g., id. § 683(c)–(d).

**7.** Each loan from the SBA to an SBIC incorporates provisions of the regulations, which allow the SBA to accelerate payment on either default or a violation of the statute or regulations, 13 C.F.R. § 107.203(b)(1); a default in payment of a debt to the SBA itself constitutes a violation of the regulations, id. § 107.906(a). Under these provisions, the SBA in 1981 accelerated Fidelity's debt, as it had both defaulted and violated other regulations. See infra p. 832.

**8.** SBICs also may guarantee obligations of small businesses, id. § 107.401, and may provide limited short-term financing, id. § 107.403(b)(1).

**9.** Fidelity is one of the rare SBICs that is an exception to this rule, as the SBA allows it to invest exclusively in real estate. See infra p. 831.

Most SBICs may not invest in farm land, id. § 107.804, provide capital for relending, lend to certain real estate firms, provide any real-estate financing unless at least 50% of the funds will be used for improvements begun within one year of financing, or lend to foreign or passive firms, id. § 107.901. In addition, no SBIC may provide assistance to a small business unless the small business certifies that it will not illegally discriminate against members of minority groups and women in its operations. Id. § 107.304(b).

**10.** Private capital is defined as private paid-in capital and paid-in surplus. Id. § 107.3. Assistance provided to affiliated corporations is presumed to be made to a single small business for the purpose of this 20% limit. Id. § 107.303(a).

**11.** The SBA determines the permissible interest rate and costs on such loans. 15 U.S.C. § 687(i); 13 C.F.R. § 107.302. Their terms must be at least five years. Id. § 107.301(a).

**12.** Control is presumed when the SBIC owns or controls 50% or more of the shares of a small business with less than 50 shareholders. 13 C.F.R. § 107.801(b)(1). The SBA will permit SBICs to retain control over a small business for a period longer than seven years only in exceptional circumstances. Id. § 107.801(g).

provide financing to "associates," which include officers, directors, major shareholders, and related companies, 15 U.S.C. § 687d; 13 C.F.R. § 107.3(a)–(h), without SBA approval. *Id.* § 107.903(b)(1).[13]

Besides limiting SBICs' financing decisions, the SBA also controls many of their other business decisions. For instance, SBICs must maintain a certain level of private capital. 15 U.S.C. § 682(a); 13 C.F.R. § 107.101(d).[14] In addition, SBICs may not, without the written consent of the SBA, make any distributions to a shareholder other than periodic payments out of retained earnings based on the capital contributions of the shareholder or increase salaries beyond an approved amount. *Id.* § 107.203(b)(3)(ii)–(iii). The SBA must approve any merger, consolidation, reorganization, or change of ownership or control. *Id.* §§ 107.601, .803.[15]

The SBA enforces the Act and regulations by requiring SBICs to make detailed filings and reports, *id.* § 107.1002, and through periodic SBA examinations of every SBIC, 15 U.S.C. § 687b(c). If an SBIC violates the Act or regulations, the SBA may petition a federal court to revoke the company's license, *id.* § 687a(a), obtain an injunction restraining future violations, *id.* § 687c(a), ask the court to take jurisdiction of the SBIC's assets and appoint the SBA as receiver, *id.* § 687c(b)–(c),[16] or petition the court to dissolve the company and declare its rights and privileges under the Act forfeit, *id.* § 687(d).[17] A loan or other transaction that violates either the Act or the regulations, however, is still valid and enforceable between the parties.[18] *Talco Capital Corp. v. Canaveral Int'l Corp.,* 225 F.Supp. 1007, 1013–14 (S.D.Fla.1964), *aff'd,* 344 F.2d 962 (5th Cir.1965).[19]

### B.

Fidelity was incorporated under Georgia law and licensed as an SBIC in late 1969, and soon merged with another SBIC, Business Investors, Inc., which had been incorporated in 1961 and was already indebted to the SBA. In 1979, Skiba and an associate, John Sisk, formed American Financial Resources, Inc. (American) to purchase the shares of Fidelity, which were owned by a subsidiary of Fidelity Mutual Life Insurance Company.[20] Skiba and Sisk each owned fifty percent of American. Their

**13.** Moreover, SBIC associates may not be officers or directors of small businesses in which SBICs have invested unless necessary to protect the investment, *id.* § 107.903(f), and SBICs may not dispose of assets to associates without SBA approval, *id.* § 107.904(a).

An associate of an SBIC who acts as an officer or director of a small business in which the SBIC has invested may not, without SBA approval, own more than three percent of the small business and may not have served as an officer or director for more than 30 days before financing. *Id.* § 107.903(f).

**14.** SBICs (like Fidelity) that were licensed before October 1, 1979, must have $150,000 of private capital; those licensed between that date and the effective date of the current regulation must have $500,000; all others must have $1 million. *Id.* § 107.101(d).

SBICs may not decrease their private capital by an amount greater than two percent per year without SBA approval, even if the capital remains above the limit, *id.* §§ 107.203(b)(3)(i), 802, and may not pledge ten percent or more of their capital without notifying the SBA, *id.* § 107.603.

**15.** The Act and regulations place many other restrictions on SBICs. *See, e.g., id.* § 107.704 (SBICs must identify themselves as SBA licensees in all written communications); *id.* § 107.708 (directing the manner in which SBICs must invest idle funds, apart from a petty cash fund of $500); *id.* § 107.710 (if an SBIC acquires assets in liquidation of an investment it has made in a small business, it must dispose of these assets within a reasonable time, and the improvements it may make to render these assets saleable are limited).

**16.** The SBA initiated the present action by asking the district court to appoint it as receiver for Fidelity. *See supra* note 1.

**17.** The SBA also may remove or suspend directors and officers of SBICs, if the officers or directors violate the Act or regulations or breach their fiduciary duty in a manner that involves personal dishonesty. 15 U.S.C. § 687e.

**18.** Those who pay interest to an SBIC in excess of the rate allowed by the SBA, however, may recover double damages from the SBIC. *Id.* § 687(i)(4)(B).

**19.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**20.** Fidelity Mutual Life Insurance Company appears to have incorporated Fidelity.

purchase of Fidelity was motivated in part by Fidelity's "grandfathered" real estate license: the SBA, when it licensed Fidelity, had allowed the company to invest exclusively in real estate, and when it later promulgated regulations limiting real estate investments, see supra p. 829 & note 9, it permitted Fidelity to continue the investment pattern authorized by earlier law. When American purchased its shares, Fidelity owed the SBA $9.6 million plus interest, and presumably already had a portfolio of investments in small businesses owning real estate.[21] It had private capital of approximately $3.5 million.

Skiba acquired Sisk's fifty percent interest in American in 1981; he has been president and sole director of American ever since. He was president of Fidelity after American purchased it, and became sole director after he purchased Sisk's American stock; the SBA, as receiver for Fidelity, removed him from office in 1986. Fidelity leased its office space from American, and paid American to manage the company, as it had no employees of its own. American and Fidelity had the same telephone number and filed consolidated tax returns; each company, however, maintained separate books and records, kept its own corporate minutes, and had its own federal employer identification number. Although American's financial report included Fidelity, Fidelity also filed a separate financial report, as the SBA regulations required.

The events that led to the conflict in this case began in 1980 when Skiba and Sisk caused either Fidelity or American, in association with an individual named Robert C. Hill, to form a real estate development corporation, Townehouse Concepts, Inc. (Townehouse).[22] In September of that same year, Fidelity financed Townehouse's purchase of a parcel of real estate in Atlanta, Georgia (the Peachtree/Cantrell property). Because the seller, Southeastern Land Fund, Inc. (Southeastern), preferred to hold a note from Fidelity rather than the newly-formed Townehouse, Fidelity purchased the property for $400,000 and thereafter conveyed the property to Townehouse instead of advancing the purchase price directly to Townehouse. Fidelity gave Southeastern a note secured by a mortgage on the property for $300,000 of the purchase price (the Southeastern mortgage), and paid $100,000 in cash. As consideration for Fidelity's conveyance to Townehouse, Townehouse assumed Fidelity's $300,000 obligation to Southeastern; Townehouse also appears to have entered on its books an obligation to repay Fidelity the $100,000 cash paid to Southeastern. The deed conveying the property from Fidelity to Townehouse was recorded after a delay of several months, which Skiba stated was due to the relationship between the companies.[23]

Fidelity also financed other real estate purchases by Townehouse, and lent it additional funds for predevelopment costs. In addition, Fidelity paid $150,000 of the $300,000 Southeastern mortgage; this payment appears to have been added to the amount Townehouse owed Fidelity. None of the loans are supported by formal docu-

---

**21.** According to the SBA's original complaint in this action, by 1977 the total of Fidelity's debt to the SBA was $9,604,816.40 plus interest. This indebtedness arose from a series of subordinated debentures that the SBA purchased from Fidelity and its predecessor SBIC, Business Investors, Inc., beginning in 1961. The total amount of principal and interest owing when the complaint was filed in 1986 was $13.8 million.

**22.** The testimony on the exact ownership of Townehouse is unclear. When Townehouse was formed, either Fidelity or American owned at least 49% of the company. Hill owned the remainder, which he pledged to Fidelity to secure advances made by Fidelity to Townehouse. Originally, Hill was the president of Towne-house. When it became apparent, sometime in 1981, that Hill could not run Townehouse effectively, American acquired his shares, and by late 1981 or early 1982, it was the sole shareholder. After Hill's interest in Townehouse terminated, Skiba served as sole director and president. Townehouse kept its own books, records, and minutes, but shared a telephone number and office with American and filed consolidated tax returns and financial reports with its parent company.

**23.** Skiba stated that the delay "wasn't a major issue since all the corporations were related. And Fidelity ..., in effect, controlled Townehouse ... under its financing arrangements ... [A]t some point we probably decided to start getting the trail a little more documented."

mentation apart from entries on each company's books evidencing intercorporate obligations, and they typically had no repayment date. Skiba and Robert L. Dodd, Jr., his attorney, represented both corporations in each loan. As a result of all these transactions, by April 2, 1982, Townehouse owed Fidelity over $1.7 million and owned the Peachtree/Cantrell property, another lot located at Peachtree and 15th Streets, and the stock of a corporation called DeFoors Place, Inc.

In 1981, Fidelity defaulted on its debt to the SBA, and the SBA demanded full payment. Besides defaulting, Fidelity had violated the regulations by pledging certificates of deposit it owned to secure a debt owed by American, its parent company, to the First Georgia Bank. When American defaulted on its obligation to First Georgia, First Georgia retained Fidelity's certificates of deposit in satisfaction of American's debt, and Fidelity took an intercompany receivable from American evidenced only by entries on each corporation's books.

In 1982, Fidelity and the SBA reached an agreement to restructure their debt. Under this agreement, which provided an extended payment schedule, Fidelity agreed that it would surrender its SBIC license after repaying the debt. Skiba and American guaranteed payment. The SBA allowed Fidelity more time to pay its debt so that the value of the real property held by Townehouse and American's other corporations[24] could grow enough to compensate the SBA for the full amount it had lent Fidelity.[25]

After Fidelity reached this agreement with the SBA, which effectively took it out of the lending business, Skiba decided, for tax and accounting reasons, to reorganize his group of corporations and to formalize the debts owed to Fidelity. To obtain security for the $1.7 million Townehouse owed Fidelity, Skiba caused Townehouse[26]

to apportion the debt among the three properties Townehouse owned; he testified that the apportionment was a rough approximation of the amounts advanced to purchase and develop each parcel. Of this sum, $500,000 was apportioned to the Peachtree/Cantrell property. On April 12, 1982, Townehouse gave Fidelity a promissory note for this amount and secured the note by granting Fidelity a mortgage on the property (the Fidelity mortgage), which was subordinate to the prior Southeastern mortgage. Townehouse then transferred the property to American, which assumed the Fidelity mortgage. American thereafter conveyed the property to a newly-formed subsidiary, Peachtree/Cantrell, Inc. (P/C, Inc.). P/C, Inc. also assumed the Fidelity mortgage. Neither American nor P/C, Inc. assumed the Southeastern mortgage.

At the end of all these transactions, P/C, Inc. owned the Peachtree/Cantrell property subject to Southeastern's $300,000 first mortgage and subject to Fidelity's $500,000 second mortgage, which it had assumed. Skiba was sole director and president of P/C, Inc. and the company's only asset was the Peachtree/Cantrell property. P/C, Inc. shared office space and a telephone number with American, and had no employees of its own. It filed consolidated tax returns and financial statements with American, but kept its own books, records, and minutes and had its own federal employer identification number.

The plaintiff-in-intervention, Commonwealth Mortgage Corporation of America (Commonwealth), entered the picture in December 1982, when it lent P/C, Inc. $3.6 million to finance the construction of residential townhomes on the Peachtree/Cantrell property. P/C, Inc. granted Commonwealth a mortgage on the property (the Commonwealth mortgage), and Skiba, individually, guaranteed the debt. P/C, Inc.

---

**24.** American owned several corporations besides those involved in the events described herein. Most owned and developed real estate. Because none are implicated in this suit, for the sake of clarity we will not describe them further.

**25.** In 1982, immediate sale of all assets owned by members of Skiba's corporate group would have repaid only one-third to one-half of Fidelity's debt.

**26.** By this time, American owned all of Townehouse's shares. *See supra* note 22.

and Skiba, in his capacity as guarantor, represented to Commonwealth that it would receive a first mortgage on the property. Fidelity, however, was not a party to the transaction, was not represented at closing, and never promised to release its mortgage.[27] After the closing, Robert L. Dodd, Jr., Skiba and P/C, Inc.'s attorney and Commonwealth's escrow agent, used $150,000 of the funds advanced to P/C, Inc. to satisfy the Southeastern mortgage and recorded its release. The Fidelity mortgage, however, was never satisfied and released.[28]

Thus, after the closing, Commonwealth did not have the first mortgage that it had bargained for, but held a second mortgage after the Fidelity mortgage of record.[29] Skiba and Commonwealth deny that they knew, during the period from 1982 to 1987, that the Fidelity mortgage was still valid. Nevertheless, Skiba executed several quitclaim deeds releasing Fidelity's interest in portions of the property as they were sold to individuals during this time. He testified, however, that he assumed that the Fidelity mortgage had been released and thought that the quitclaim deeds were purely cosmetic.

By 1986, Fidelity had again defaulted on its scheduled payments to the SBA. In accordance with the Act and regulations, therefore, the district court appointed the SBA as receiver under the continuing supervision of the court, initiating the present action. *See supra* notes 1, 16.

In February 1987, P/C, Inc. defaulted on its mortgage to Commonwealth, and Commonwealth foreclosed,[30] bid the amount of its outstanding debt at sale, and obtained a deed to the property. Commonwealth provided no notice to Fidelity, the holder of the first mortgage of record, other than the advertisements required by statute.

Meanwhile, Fidelity had received no payments from P/C, Inc. on its mortgage. Accordingly, in June 1987, the SBA, in its capacity as receiver, also began foreclosure[31] proceedings under the Fidelity mortgage. At this point, Commonwealth intervened in the receivership action, claiming that it owned the Peachtree/Cantrell property because of its earlier foreclosure.

## II.

In its order of November 13, 1987 (the 1987 Order), which the SBA appealed to this court in *Fidelity I*, the district court, after a bench trial on the merits of Commonwealth's claim, found that Skiba, as president of P/C, Inc. and as individual guarantor, had represented that Commonwealth would receive a first lien position. It also found that Fidelity was Skiba's alter ego, and therefore was bound by Skiba's representation. In essence, according to the court, Commonwealth lent money directly to Skiba; it was therefore inequitable to allow him to get a $500,000 windfall by permitting Fidelity to foreclose on its mortgage. Accordingly, the district court issued an injunction forbidding the SBA from foreclosing on the Fidelity mortgage and directing it to execute and deliver a release of the Fidelity deed to Common-

**27.** In its order of November 23, 1987, the district court found that although "all persons involved in the loan transaction intended that Commonwealth receive a first lien position," "Skiba was not formally acting as President of [Fidelity] at ... the closing," and Fidelity "did not affirmatively promise to release its deed." It reached its conclusion that Fidelity was bound by the representations of those involved in the transaction by finding that Fidelity was Skiba's alter ego; we remanded for findings of fact and conclusions of law to support that holding.

**28.** See *Fidelity I*, 888 F.2d at 1346–47, for a full description of the entire transaction.

**29.** Commonwealth intervened to attempt to correct this problem.

**30.** Commonwealth executed a nonjudicial foreclosure under the power of sale clause in its mortgage. Georgia law impliedly authorizes a nonjudicial foreclosure under a power of sale clause by providing minimal statutory standards for such sales. *Fidelity I*, 888 F.2d at 1345 n. 2 (citing Ga.Code Ann. § 44–14–162 (1982); *Global Indus. v. Harris*, 376 F.Supp. 1379, 1383 (N.D. Ga.1974)).

**31.** This action also was a nonjudicial foreclosure under a power of sale clause.

wealth.[32]

The SBA appealed. On appeal, we found that the district court could not conclude, from the fact that Skiba owned and controlled Fidelity and used the corporation for his own ends, that Fidelity was his alter ego, especially as the court had found that "the corporate forms of ... [Fidelity] ha[d] been scrupulously maintained." *Fidelity I*, 888 F.2d at 1348. We stated that more evidence of abuse of the corporate form was necessary, *id.*,[33] and remanded, directing the district court to make the findings of fact it had neglected.

On remand, the district court made several specific findings of fact. First, the district court reiterated its earlier conclusion that Skiba effectively owned Fidelity through his ownership of American, was its sole director and president, and controlled its business decisions. Second, the district court noted that Skiba caused Fidelity to serve as a "private lender" in an "informal financial relationship" with American, Townehouse, and Skiba's other corporations.[34] As examples of such informality, the district court cited the manner in which Fidelity purchased the Peachtree/Cantrell property for Townehouse and the delay in recording the deed conveying the property, *see supra* pp. 831–832, Fidelity's pledge of its certificates of deposit to secure the loan from First Georgia to American in violation of SBA regulations, *see supra* p. 832, and Fidelity's practice of lending funds to other Skiba corporations without any repayment date or formality beyond entries on the corporate books when both corpora-

tions in each transaction were represented by Skiba and Dodd, *see supra* p. 832.

Third, the district court found that Skiba ran all the members of his "incestuous" group of corporations for the benefit of Fidelity in order to allow Fidelity to pay its debt to the SBA, which Skiba had personally guaranteed. After the SBA and Fidelity reached their agreement to restructure and extend Fidelity's debt in 1982 in order to allow time for the assets of Skiba's corporations to appreciate, *see supra* p. 832–833, Skiba reorganized his corporate structure and formalized his corporations' obligations to Fidelity. The allocation of $500,000 of Townehouse debt to Fidelity, the second mortgage on the property in favor of Fidelity, and the transfer of the property to P/C, Inc., *see supra* pp. 832–833, were all "essentially paper transactions" that were part of this process.

Fourth, the district court emphasized that Skiba, in a "gratuitous payment by one corporation of a related corporation's debt," caused P/C, Inc. to pay Fidelity's debt to Southeastern (which P/C, Inc. had never expressly assumed) out of the proceeds of the Commonwealth loan, *see supra* p. 833. Finally, the district court found that Skiba caused Fidelity to be thinly capitalized in violation of SBA regulations by lending money to other Skiba corporations without adequate security.

These five findings, according to the district court, are sufficient under Georgia law to support the conclusion that Fidelity was Skiba's alter ego; it therefore found that Fidelity was bound by Skiba's repre-

---

**32.** We rely on our opinion in *Fidelity I* for a full description of the district court's 1987 Order. The 1987 Order read, in pertinent part:

> Considering all the evidence and testimony presented, this court cannot allow [Fidelity] to foreclose on the [Fidelity] deed. *It is true that the corporate forms of [P/C, Inc.] and [Fidelity] have been scrupulously maintained, and that [Fidelity] did not affirmatively promise to release its deed. However, the reality was that [Fidelity] and [P/C, Inc.] were, for all intents and purposes, Mr. Skiba.* Mr. Skiba's intent was to release that deed. He testified that had he been presented a release, he

> would have signed it as president of [Fidelity]. This court could not in equity allow Mr. Skiba or [Fidelity] to benefit from their failure to carry out what was agreed and intended.

(Footnote omitted; emphasis added.) The district court also found that the SBA as receiver was bound to the same extent as Fidelity.

**33.** For instance, commingling of assets or failure to maintain separate corporate records. *Fidelity I*, 888 F.2d at 1348.

**34.** Skiba testified that Fidelity provided the "seed money" for all of American's various real estate ventures.

sentations to Commonwealth.[35] We disagree, for the reasons set forth below.

## III.

█ Federal Rule of Civil Procedure 52(a) provides that findings of fact made by a district court sitting without a jury may not be reversed unless clearly erroneous.[36] The resolution of the factual components of the alter ego issue is governed by the clearly erroneous standard. *See United Steelworkers of Am. v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir.1988) (" '[R]esolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court. Consequently, in reviewing the district court's finding, we apply the clearly erroneous standard of review....' " (quoting *United States v. Jon–T Chems., Inc.* 768 F.2d 686, 691 (5th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986)), *cert. denied*, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989); *Combs v. Ryans Coal Co.*, 785 F.2d 970, 982 (11th Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). Under this standard, we find that the district court's findings of fact on the alter ego issue are not clearly erroneous.

Our review of the district court's application of the law to its findings of fact, however, is de novo. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 486, 104 S.Ct. 1949, 1952, 80 L.Ed.2d 502 (1984) (Rule 52(a) "does not inhibit an appellate court's power to correct errors of law"); *Keys Jet Ski, Inc. v. Kays*, 893 F.2d 1225, 1227 (11th Cir.1990). We hold, therefore, that the facts as found by the district court are insufficient in Georgia law to permit a conclusion that Fidelity was Skiba's alter ego.

█ Under Georgia law, a corporation and its shareholders and officers are separate, even if one person owns all of its shares and controls its actions. *Corley v. Cozart*, 115 F.2d 119, 121 (5th Cir.1940) (interpreting Georgia law); *Amason v. Whitehead*, 186 Ga.App. 320, 367 S.E.2d 107, 108 (1988); *Raynor v. American States Ins. Co.*, 176 Ga.App. 564, 337 S.E.2d 43, 45 (1985). The corporation is not bound by the acts of the owner as an individual, *Casey v. Carrollton Ford Co.*, 152 Ga.App. 105, 262 S.E.2d 255, 256–57 (1979); *Engineered Builders, Inc. v. Lamar Nash Buick–Pontiac, Inc.*, 133 Ga. App. 141, 210 S.E.2d 179, 180 (1974), and the owner is not bound by corporate acts, even though the individual may dictate every corporate decision, *Earnest v. Merck*, 183 Ga.App. 271, 358 S.E.2d 661, 663 (1987).

█ When the person who owns or controls the corporation has abused this privilege, however, by using the corporate form to defeat justice, perpetuate fraud, promote crime, evade contractual or tort responsibil-

---

**35.** The district court found that the Commonwealth loan "was made with both the actual and constructive knowledge of both American and Fidelity who acted solely through Skiba." The loan "directly benefitted" Fidelity (through the payment of its Southeastern obligation and, presumably, through the increase in value of the property that eventually would allow Fidelity to pay its debt to the SBA). In light of this knowledge and benefit, the district court concluded:

It would defeat justice, promote fraud and allow the SBA [acting as receiver] to evade its contractual responsibilities if Skiba and his agents, while representing Peachtree, were allowed to make representations to Commonwealth that it would receive the first lien position on the property, and such representations were not binding on Fidelity whose principal Skiba also knew that Commonwealth would not have made the loan unless it received a first lien position. Because the SBA

stands in the shoes of Fidelity in this action and *because Skiba abused Fidelity's corporate form,* the SBA is barred by equitable principles from foreclosing on Fidelity's deed. (Emphasis added.)

**36.** Federal Rule of Civil Procedure 52(a) states, in pertinent part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." If the district court's findings of fact are "plausible in light of the record viewed in its entirety," the court of appeals must accept them even if it is "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also Worsham v. United States*, 828 F.2d 1525, 1526–27 (11th Cir.1987).

ity, or for any other reason which in equity or good conscience would justify the disregard of the corporate entity, the court may pierce the corporate veil in order to correct the abuse. *Amason*, 367 S.E.2d at 108 (quoting *Jenkins v. Judith Sans Int'l*, 175 Ga.App. 171, 332 S.E.2d 687 (1985)); *Williams Plaza, Inc. v. Sedgefield Sportswear Div. of Blue Bell, Inc.*, 164 Ga.App. 720, 297 S.E.2d 342, 343 (1982); *Jones v. Cranman's Sporting Goods*, 142 Ga.App. 838, 237 S.E.2d 402, 405 (1977).

■ One theory used by Georgia courts to pierce the corporate veil under this standard is that the corporate entity is the alter ego or business conduit of its owner, and should therefore be disregarded. *See, e.g., Derbyshire v. United Builders Supplies, Inc.*, 194 Ga.App. 840, 392 S.E.2d 37, 40 (1990). To establish that a corporation is an alter ego, a party must show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs, that the corporation and its owners have such unity of interest and ownership that they lack separate personalities, and that to observe the corporate form would work an injustice or promote fraud. *Maley v. Carroll*, 381 F.2d 147, 153 (5th Cir.1967) (interpreting Georgia law); *Farmers Warehouse v. Collins*, 220 Ga. 141, 137 S.E.2d 619, 625 (1964); *Southern Envtl. Group, Inc. v. Rosebud Landscape Gardeners, Inc.*, 196 Ga.App. 392, 395 S.E.2d 913, 915 (1990); *Derbyshire*, 392 S.E.2d at 40; *Amason*, 367 S.E.2d at 108.

■ This standard for the determination of whether a corporation is the alter ego of its shareholders or officers is difficult to meet. Accordingly, courts must exercise "great caution," and must not disregard the corporate entity without a showing that the corporate form has been abused. *Maley*, 381 F.2d at 153; *Amason*, 367 S.E.2d at 108. The mere fact that a person owns and controls a corporation will

not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends. *Derbyshire*, 392 S.E.2d at 40; *Amason*, 367 S.E.2d at 108; *Boafo v. Hospital Corp. of Am.*, 177 Ga.App. 75, 338 S.E.2d 477, 479 (1985); *Condenser Serv. & Eng'g Co. v. Brunswick Port Auth.*, 87 Ga.App. 469, 74 S.E.2d 398, 402 (1953). Similarly, that two corporations have been incorporated by the same party and have the same officers does not mean that the two corporations are interchangeable. *Trans–American Communications, Inc. v. Nolle*, 134 Ga.App. 457, 214 S.E.2d 717, 719 (1975); *Collins v. Booker*, 129 Ga.App. 824, 201 S.E.2d 676, 677–78 (1973).

■ More evidence of abuse, such as evidence that the controlling person commingled the corporation's assets with his own or those of other corporations he controlled, or that he failed to maintain corporate records separately, is essential. *Stewart Bros. v. Allen*, 189 Ga.App. 816, 377 S.E.2d 724, 725–26 (1989); *Amason*, 367 S.E.2d at 108; *Earnest*, 358 S.E.2d at 663; *Abbot Foods, Inc. v. Elberton Poultry Co.*, 173 Ga.App. 672, 327 S.E.2d 751, 752 (1985). Abuse of the corporate form occurs when the owner of the corporation conducts his private and corporate business on an interchangeable or joint basis. *Stewart Bros.*, 377 S.E.2d at 725; *Earnest*, 358 S.E.2d at 663; *Bone Constr. Co. v. Lewis*, 148 Ga. App. 61, 250 S.E.2d 851, 853 (1978); *cf. Federal Deposit Ins. Corp. v. United States*, 654 F.Supp. 794, 810 (N.D.Ga.1986) (under Georgia law, "[p]roof of the alter ego relationship consists substantially o[f] how the controlling person treated the disputed entity").

The district court's findings of fact do not show, under this standard, that Skiba has abused Fidelity's corporate form; the court erred, therefore, by holding that Fidelity was Skiba's alter ego.[37] We will

37. The effect of disregarding the corporate entity is generally to hold that the individual (or parent corporation) who owns or controls a corporation is liable for the corporation's torts or contracts. *See Condenser Serv.*, 74 S.E.2d at 402. In this case, however, disregarding Fideli-

ty's corporate form will lead to the opposite result. If Skiba and Fidelity are one, Skiba's representations, as an individual, bound Fidelity:

The effect of applying the alter ego doctrine ... is that the corporation and the person

consider the district court's five findings in turn, and then consider whether any other evidence in the record will support its conclusion.

■ First, Skiba's beneficial ownership (through his ownership of American) of Fidelity, and the fact that he was the sole director and president of the company and controlled all its business decisions, are insufficient by themselves to allow a finding that the company was Skiba's alter ego. *See, e.g., Derbyshire*, 392 S.E.2d at 40.

■ Second, Fidelity's practice of lending money, as "private lender" to Townehouse, American, and other Skiba corporations with few formalities does not show that Skiba abused Fidelity's corporate form. An entry on the corporate books is a sufficient formality, under Georgia law, for

> who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound....
>
> *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) (quoting *Shamrock Oil & Gas Co. v. Ethridge*, 159 F.Supp. 693, 697 (D.Colo.1958)).

**38.** Georgia courts have found, in similar cases, no abuse of the corporate form. *See Stewart Bros.*, 377 S.E.2d at 725–26; *Williams Plaza*, 297 S.E.2d at 344–45 (no abuse of the corporate form when a parent lent money to its subsidiary and the two were joint obligors on a note when no evidence of commingling of funds, confusion of records, or "milking" the assets of the subsidiary for the benefit of the parent existed). Indeed, Georgia law is clear that more evidence of commingling of funds and abuse of the corporate form is needed to elevate an "informal financial relationship" to the level required to pierce the corporate veil. *See Anderson v. Chatham*, 190 Ga.App. 559, 379 S.E.2d 793, 796–97 (1989) (corporate veil pierced when sole shareholder listed assets of corporations on personal financial statement and paid personal expenditures from corporate accounts); *Abbott Foods*, 327 S.E.2d at 752 (abuse occurred when the president, majority shareholder, and only employee of a company paid himself salary advances from an overdrawn account and used company funds to purchase the stock of another company for himself and to make loans and insurance payments on his personal automobile); *Saxton v. Luke*, 164 Ga.App. 170, 296 S.E.2d 751, 752 (1982) (shareholders of corporation liable on a contract it signed when the corporation's existence was largely ignored by its shareholders, it issued no stock and held no meetings, and its president indorsed its checks

an intercorporate loan. *Cf. Stewart Bros.*, 377 S.E.2d at 725–26 (notation in company checkbook that clearly identified checks written by owner of corporation to himself as "loans" was sufficient formality in the absence of evidence of commingling of funds or confusion of records). Most important, the district court cited no evidence, despite the informal relations between the corporations, that Skiba ever commingled his funds with Fidelity's or caused any of his corporations to commingle funds with each other.[38] Corporate records and forms were, as the district court stated in its 1987 Order, scrupulously maintained.[39]

■ Third, the district court's finding that Skiba ran all his corporations for the benefit of Fidelity to allow Fidelity to repay the SBA will not justify its conclusion that Fidelity was Skiba's alter ego. Fideli-

> individually and personally guaranteed its obligation); *Sheppard v. Tribble Heating & Air Conditioning, Inc.*, 163 Ga.App. 732, 294 S.E.2d 572, 573 (1982) (an undercapitalized corporation was the alter ego of its sole shareholder, who made all business decisions, held few corporate meetings, used the same office for his other businesses, used corporate employees on personal projects, and diverted corporate funds for his personal and other corporate expenses).

**39.** In lending money to associates and pledging its certificates of deposit for the benefit of American, we realize that Fidelity (and Skiba) may well have violated several provisions of the Act and regulations governing SBICs. *See, e.g., United States v. Vanguard Inv. Co.*, 694 F.Supp. 1219, 1226 (M.D.N.C.1988) (SBIC license revocation justified when SBIC "ha[d] long history of difficulty in meeting its obligations ... [and its] operation [had] declined such that it more closely resemble[d] a real estate holding company than a [SBIC]" and had violated several of the regulations), *aff'd*, 907 F.2d 439 (4th Cir.1990); *Electronic Sys. Inv. Corp. v. Small Business Admin.*, 405 F.2d 188, 189 (4th Cir.1968) (SBIC that financed a small company with a common director violated regulations), *cert. denied*, 394 U.S. 1014, 89 S.Ct. 1633, 23 L.Ed.2d 41 (1969). As we note above, however, a loan or other transaction that violates either the Act or the regulations is still valid and enforceable between the parties. *Talco Capital Corp.*, 225 F.Supp. at 1013–14. Moreover, no private right of action exists for a violation of the Act or the regulations. *Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324, 1330–31 (S.D.N.Y.1974). Fidelity's violations of SBA rules are relevant to its status as an SBA licensee, not to Skiba's abuse of the corporate entity.

ty owed a legal debt to the SBA, and the other Skiba corporations owed legal and enforceable debts to Fidelity for the money it had advanced to them. Skiba merely tried to run his companies in a manner that would allow all of them to repay their legal obligations, develop the assets they owned, and sell these assets at a profit. This is not abuse of the corporate form.

Fourth, the district court states that P/C, Inc.'s payment of the remaining balance of the Southeastern mortgage owed by Fidelity was evidence of abuse of the corporate form. We disagree. Under Georgia law, a court may disregard the corporate form if one corporation has "bled" or depleted the assets of another for its own benefit. *See Brunswick Mfg. Co. v. Sizemore,* 183 Ga.App. 482, 359 S.E.2d 180, 182 (1987) (jury could determine that a parent was liable for debts owed by its subsidiary, even though corporate forms were maintained, when there was evidence that proceeds from sales made by the subsidiary were deposited in the parent's account); *Trans–American Communications,* 214 S.E.2d at 719–20 (the relevant inquiry is whether the parent had "systematically drained off" the assets of the subsidiary to benefit the parent or the other subsidiaries). In this case, however, P/C, Inc.'s payment was made not for Fidelity's benefit, but for its own. Any benefit to Fidelity was incidental. P/C, Inc. was the equitable owner of the Peachtree/Cantrell property, which was still subject to the Southeastern mortgage. *See Mickel v. Pickett,* 241 Ga. 528, 247 S.E.2d 82, 87 (1978); *Tomkus v. Parker,* 236 Ga. 478, 224 S.E.2d 353, 354 (1976). Because it had borrowed money on the property using its equitable interest as security, and had promised Commonwealth a first lien position, it paid Southeastern in an effort to purchase clear title to the property. This was not, in the words of the district court, a "gratuitous payment of one corporation's debt by a related corporation."

Fifth, the district court found that Fidelity was Skiba's alter ego because the company was inadequately capitalized in violation of SBA regulations. It had inade-quate capital, according to the court, because it had lent money to related companies without adequate security. We agree that Fidelity had made poor investment decisions and suffered financial reverses that caused it to become insolvent; this is not, however, a reason to disregard the corporate entity. Georgia law will allow the disregard of the corporate entity when a corporation is thinly capitalized *at the time of formation* and other evidence of abuse of the corporate form is present. *Hyzer v. Hickman,* 195 Ga.App. 213, 393 S.E.2d 79, 81 (1990), *cert. granted,* No. S90C0993 (Ga. May 24, 1990) (corporate veil pierced when thinly capitalized corporation also made preferential distributions to shareholder when it was insolvent). "A corporation that was adequately capitalized when formed but later suffers financial reverses is not undercapitalized." *Id.* (quoting 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 44.1, at 529 (rev. perm. ed. 1983)).

Finally, our review of the record has indicated some other factors, not specifically included in the district court's findings of fact, that might be relevant in an alter ego determination. For instance, Fidelity and American shared offices, had the same telephone number, filed consolidated tax returns, and both seem to have used American's stationary for business communications. American managed Fidelity pursuant to a management agreement, and Fidelity had no employees of its own. Such factors, in combination with other indications of abuse of the corporate form, may indicate that the corporation is the alter ego of its owner or parent. *See Najran Co. for Gen. Contracting & Trading v. Fleetwood Enters.,* 659 F.Supp. 1081, 1096–97 (S.D.Ga.1986) (interpreting Georgia law). In this case, however, that Fidelity shared offices, stationery, and employees with American does not, without other evidence that Skiba abused Fidelity's corporate form, compel us to conclude that Fidelity and Skiba are one and the same. *See Trans–American Communications,* 214 S.E.2d at 717 (a holding company and its wholly owned subsidiary may be separate entities even though they share the same

offices and bookkeeping facilities and trade information and employees).

We hold, therefore, that Fidelity was not Skiba's alter ego and was not bound by his representations.[40] In the end, all that the district court's findings of fact on abuse of the corporate form show is that Skiba controlled Fidelity, caused it to make some poor business decisions by investing in related companies, and then attempted to run Fidelity and the related companies in a manner that would allow them to repay their legal obligations and make a profit.[41] The evidence shows that Fidelity advanced $500,000 cash to Townehouse, and took a mortgage as security on this debt. It is inconceivable that Fidelity would agree to release this debt for nothing,[42] and we decline to allow the district court to force it to do so.

### IV.

For the reasons stated above, the judgment of the district court is VACATED and the case-in-intervention is REMANDED with the instruction that it be dismissed with prejudice.

IT IS SO ORDERED.

---

40. The court therefore may not use its equitable powers to force Fidelity to release its mortgage. *Cf. Brega v. CSRA Realty Co.*, 223 Ga. 724, 157 S.E.2d 738, 739–40 (1967) (court refused to order a corporation to perform a contract to sell land signed by its vice-president in his individual capacity); *Jolles v. Holiday Builders, Inc.*, 222 Ga. 358, 149 S.E.2d 814, 815 (1966) (neither president nor corporation liable for specific performance of contract for sale of land when president held title individually but signed contract as representative of corporation).

41. We note that one Georgia case seems to be factually similar to the instant case. In *Derbyshire*, 392 S.E.2d at 40, the court held that a shareholder in a group of interlocking corporations and several of those corporations were liable on a lease signed by a representative of one of the corporations. The court refused to overturn a jury verdict, based on somewhat "ambiguous" evidence, that the shareholder used the corporations as his alter ego, because (1) the corporations acted as a unit, (2) he referred to them interchangeably and had diffi-

culty remembering which corporation had which officers, (3) he was president and sole owner of three corporations, (4) the corporations dealt with the lessor as "an amalgamated whole," stating "*we* would like to exercise our option," (5) the corporations functioned together to produce a common product, and (6) the corporations used the same address and occupied the same building. *Id.* at 40–41. The case is distinguishable, however: a key factor in *Derbyshire* was that the corporations dealt with the lessor as a unified group. Commonwealth, on the contrary, dealt only with Skiba and with P/C, Inc. Indeed, witnesses employed by Commonwealth when it made the loan to P/C, Inc. testified that they did not recall knowing of Fidelity's existence when the loan was made and that they dealt only with P/C, Inc. and Skiba, individually, and all parties agree that Fidelity was never mentioned at the closing.

42. Indeed, Skiba testified in deposition that if Fidelity had released its mortgage, a $500,000 debt to Fidelity would have been entered on P/C, Inc.'s books as an unsecured obligation.